# Illinois Official Reports

## Appellate Court

---

### *People v. Johnson*, 2019 IL App (1st) 162999

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Respondent-Appellee, v. MICHAEL JOHNSON, Petitioner-Appellant. |
| District & No. | First District, Fourth Division No. 1-16-2999 |
| Filed | December 26, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 03-CR-8365; the Hon. Diane Cannon, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Thomas A. Lilien, and Darren E. Miller, of State Appellate Defender's Office, of Elgin, for appellant. |
| | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, John E. Nowak, and Noah Montague, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion. Justices Lampkin and Burke concurred in the judgment and opinion. |

**OPINION**

¶ 1        Defendant Michael Johnson appeals from the second-stage dismissal of his petition for postconviction relief. After a jury trial, he was convicted of first degree murder with a firearm and sentenced to 75 years with the Illinois Department of Corrections.

¶ 2        In this appeal, defendant claims (1) that his trial counsel was ineffective for failing to move to suppress his statements on the ground that the police questioned him after he had invoked his right to counsel in violation of *Edwards v. Arizona*, 451 U.S. 477 (1981), and (2) that his appellate counsel was ineffective for failing to argue that his trial counsel was ineffective for failing to raise the *Edwards* violation.

¶ 3        In response, the State argues (1) that defendant's trial counsel did, in fact, claim in defendant's pretrial motion to suppress, among other things, that police interrogation continued after defendant had asserted his right to counsel; (2) that the trial court held a suppression hearing on this motion, at which defendant testified; (3) that, during arguments at the hearing, the State cited *People v. Perry*, 147 Ill. 2d 430 (1992), an Illinois Supreme Court case that discussed the United States Supreme Court case of *Edwards*; and (4) that the trial court denied defendant's suppression motion finding, "based on the credibility of the witnesses," that defendant received *Miranda* warnings and voluntarily chose to make a statement. See *Miranda v. Arizona*, 384 U.S. 436 (1966).

¶ 4        In reply, defendant argues (1) that, although defendant's pretrial motion claimed that interrogation continued after defendant invoked his right to counsel, the motion did not specifically cite *Edwards*; (2) that, although the State cited an Illinois case discussing *Edwards*, defendant's trial counsel did not offer an argument in response; and (3) that, although the trial court denied defendant's motion on credibility grounds, the trial court did not specifically articulate a ruling on the *Edwards* issue. In addition, defendant argues that this court may not consider credibility issues until the third stage of the postconviction process.

¶ 5        For the reasons stated below, we find that this issue was litigated prior to defendant's trial and, thus, neither his trial counsel nor his appellate counsel can be found ineffective for failing to raise it. As a result, we affirm the second-stage dismissal of defendant's postconviction petition.

¶ 6                                         BACKGROUND

¶ 7        This court has set forth the facts of this case and discussed the evidence at trial in a prior order (*People v. Johnson*, No. 1-08-1095 (2010) (unpublished order under Illinois Supreme Court Rule 23)), which we incorporate here by reference. Since we do not need to consider the sufficiency of evidence at trial, we provide here only a short synopsis of the offense and the evidence.

¶ 8        The State's evidence at trial established that defendant, acting as a hit man for drug dealer Marc Norfleet, killed police informant Adam Schultz. The evidence at trial included defendant's own videotaped statement, in which defendant admitted that, in exchange for Norfleet's promises of both money and entry into the drug business, he shot the victim. During his videotaped statement, defendant stated that Norfleet drove him, as well as defendant's nephew Larry Jones and the victim, to the mouth of an alley where defendant and the victim exited the vehicle. In the alley, the victim turned his head, and defendant shot him once in the

head. Defendant's confession was corroborated by the trial testimony of defendant's nephew Larry Jones, who testified that Jones, Norfleet, defendant, and the victim drove around; that they made a stop at which defendant and the victim exited the vehicle; and that Jones and Norfleet drove away and returned after 15 minutes to pick up defendant, who was then alone. In addition, defendant stated on the videotape that Norfleet had given him a .38-caliber revolver, and that fact was corroborated by the testimony of a firearms expert who testified that the bullet fragments found in the victim's body came from a single .38-caliber bullet.

¶ 9 The issue in this appeal concerns defendant's pretrial suppression motion, the subsequent hearing on that motion, the parties' arguments at the hearing, and the trial court's ruling at the conclusion of the hearing, so we describe those facts in more detail.

¶ 10 On February 28, 2007, defendant's trial counsel filed a motion to suppress statements that claimed, among other things, "[t]hat the statements sought to be suppressed were obtained as a result of interrogation which continued after the defendant had elected to remain silent and had elected to consult with an attorney prior to further questioning in violations of the 5th and 14th Amendments."

¶ 11 At the suppression hearing held on September 26, 2007, both sides waived opening statements, but the State asked "that the defendant be sworn to the motion." Defendant then swore under oath that he had read the motion.

¶ 12 Detective John Callaghan testified that, on December 20, 2001, while working at Area 5 in Chicago, he was assigned to investigate the murder of Adam Schultz, which had occurred five days earlier. In connection with that investigation, he learned that Milwaukee police had arrested defendant on July 8, 2002, regarding an unrelated murder and had also arrested Franklin Bogan on July 9, 2002, for a narcotics offense. Between July 13 and July 23, 2002, Callaghan interviewed Bogan because Bogan indicated he had received information about the Schultz murder from defendant, who had been talking about it in jail. On August 13, 2002, Callaghan interviewed Bogan again with Assistant State's Attorney (ASA) Michael McHale for the purpose of obtaining Bogan's consent for a "consensual overhear." The trial court signed an order authorizing the consensual overhear, and between August 14 and September 3, 2002, several attempts were made to record conversations between defendant and Bogan.

¶ 13 Callaghan testified that, on August 27, 2002, he located defendant's nephew Larry Jones in the Cook County Jail and transported him to Area 5 to interview him; but Jones denied knowing any of the parties involved in the Schultz murder. On the same date, August 27, 2002, a Milwaukee detective, Paul Bratonja, and Deputy U.S. Marshal Patrick Amerson arrived in Chicago with defendant in custody for the purpose of investigating an unrelated Milwaukee murder. Callaghan did not know prior to that day that they were bringing defendant to Chicago. Callaghan did not interview defendant then and was not aware of any interviews with defendant at Area 5 on that date.

¶ 14 Callaghan testified that on that same date, August 27, 2002, he learned that codefendant Marc Norfleet, the person who ordered the Schultz murder, had been arrested in Neenah, Wisconsin. On September 3, 2002, Callaghan went to Milwaukee to meet with defendant at a Milwaukee police station. In the interview room, Detective Robert Carrillo advised defendant of his *Miranda* rights, and defendant indicated he understood his rights and agreed to speak with them. The detectives confronted defendant with some of the evidence, but he denied any knowledge of the offense. Detective Carrillo explained that an ASA from Cook County was present in Milwaukee, and defendant indicated he would like to speak with her. The detectives

exited the room, and ASA Ward and Detective Carrillo returned and conducted subsequent interviews with defendant. Callaghan obtained lunch for defendant and provided him with cigarettes but was not present for the subsequent interviews. At 5:43 p.m. on September 3, 2002, defendant provided a videotaped statement in the presence of ASA Ward and Detective Carrillo. ASA Ward had brought with her from Chicago a tripod and a camera, which Callaghan started before exiting the room.[1]

¶ 15   Detective Callaghan testified that the entire time that he was with defendant on September 3, 2002, defendant never asked for an attorney, never indicated that he wanted to remain silent, and never refused to talk with them. Neither Callaghan nor anyone in his presence questioned defendant regarding the offense in Milwaukee for which defendant was being held. Neither Callaghan nor anyone in his presence told defendant that if defendant did not cooperate he would receive the death penalty. No one drew two boxes, labeled one box "live" and the other box "die," and told defendant to choose. No one told defendant that if he provided a statement he would not receive the death penalty but that if he did not provide a statement his nephew, Larry Jones, would be charged with first degree murder and face the death penalty.

¶ 16   On cross-examination, defendant's trial counsel asked whether, in July 2002, Callaghan knew that defendant had an attorney representing him on the unrelated case in Milwaukee. Callaghan testified that he had "no idea" whether defendant had an attorney in July 2002, and Callaghan did not check to determine if defendant was represented in the Milwaukee case. On redirect examination, Callaghan testified that, on September 3, 2002, defendant also asked questions and posed hypotheticals to the detectives. In response to defendant's hypotheticals, the detectives informed him that there was an ASA to whom he could speak. On recross-examination, Callaghan testified that, on September 3, 2002, defendant asked "how long could a person get for something like this" and what the possible penalties were. Callaghan did not recall if he told defendant that "he was looking at the death penalty." Callaghan admitted that the police report does not indicate that defendant asked any hypothetical questions or "what-if's."

¶ 17   ASA Kim Ward testified that, on August 26, 2002, she met with Detective Robert Carrillo and ASA Michael Hale for the purpose of obtaining an arrest warrant for Marc Norfleet based on an accountability theory. Ward traveled to Neenah, Wisconsin, on August 27, 2002, when the Norfleet arrest warrant was executed. On September 3, 2002, she traveled with Detectives Carrillo and Callaghan to Milwaukee to speak with defendant. The detectives interviewed defendant first at 10:56 a.m. for a half-hour, and then Ward met with defendant at 11:45 a.m. with Detective Carrillo. When she entered the room, she explained that she was an ASA and not his lawyer, and he indicated that he understood that. She explained that the *Miranda* warnings that he already been given still applied, and he said he understood. When she asked defendant if he wanted to talk to her, he said yes. During the course of their conversation, defendant received cigarettes and M&M's. The introductions finished at noon, and the interview itself lasted three hours. After Detective Carrillo confronted defendant with a newspaper article concerning Norfleet's arrest, defendant then implicated himself. When presented with options for memorializing his statement, defendant chose a videotaped statement, which began at 5:43 p.m. Prior to the start of the statement, defendant signed a consent to videotape form that was also signed by Ward and Carrillo.

---

[1]This was later contradicted by ASA Ward, who said that she started the camera.

¶ 18    On cross-examination, Ward testified that, toward the beginning of her interview, defendant was "giving a bunch of hypotheticals" and "initiating a lot of questions." Specifically, defendant asked, if someone was paid to murder someone, what would the penalty be and would he be eligible for the death penalty. Ward replied that the death penalty was one of the punishments. Ward testified that Detective Callaghan was not present for the video and that she "did" the video, placing it on a tripod and trying to center it.

¶ 19    On redirect examination, Ward testified that she spoke to defendant twice outside the presence of the detectives: once at 11:45 a.m. when Detective Carrillo went to retrieve the Norfleet article and once at 5:30 p.m. prior to the videotaping. At 11:45 a.m. she confirmed with defendant that the detectives had treated him well. The second time, prior to the videotaping, she explained to defendant that she would be the person "turn[ing] it on" and she also reviewed his *Miranda* rights with him, reading them word for word from a piece of paper she carried with her. Ward told defendant that these rights applied during the entire videotaping and that, at any point, he could stop.

¶ 20    Detective Carrillo testified that on September[2] 3, 2002, he went to Milwaukee to meet with defendant, and he and Detective Callaghan interviewed defendant starting at 10:56 a.m. Carrillo read defendant his *Miranda* rights from a preprinted form. After each right, defendant indicated verbally that he understood, and at the end, he stated that he wished to speak with the detectives. During the ensuing half-hour interview, defendant did not implicate himself in the offense, but he did pose "hypotheticals," asking about penalties. That is when the detectives asked if defendant would like to speak to an ASA, and he indicated that he would, so they asked ASA Ward to enter. Before she entered, Carrillo informed her that he had already advised defendant of his rights. The second interview, with ASA Ward present, began at 11:45 a.m. and lasted three hours. Ward began by advising defendant that his *Miranda* rights were still in effect. Defendant implicated himself during the interview and chose to memorialize his statement by videotape, which was done. In court, Carrillo identified the consent to videotape form signed by defendant and Carrillo.

¶ 21    Detective Carrillo testified that at no time while defendant was with him on September 3, 2002, did defendant ask for an attorney or ask to remain silent. Defendant did not refuse to speak with Carrillo or anyone else. Neither Carrillo nor anyone in Carrillo's presence questioned defendant regarding the Milwaukee case or told him that if he did not cooperate he would receive the death penalty. Carrillo did not draw two boxes, one that said "live" and one that said "die," and ask defendant to choose between them. Neither Carrillo nor anyone in his presence told defendant that if he gave a statement he would not receive the death penalty. Carrillo also did not tell defendant that if he did not cooperate his nephew Larry Jones would be charged with first degree murder and would face the death penalty.

¶ 22    On cross-examination, Carrillo testified that he did not take any notes during the first interview at 10:56 a.m. or during the second interview at 11:45 a.m., and he did not recall whether defendant was handcuffed. The interview room was a small, windowless room. During the questioning, Carrillo told defendant that he was accused of shooting Adam Schultz in the head in Chicago, at a certain date, time, and place. Carrillo's report does not state that defendant initially denied any involvement in the offense or that defendant posed hypotheticals to the

_____

[2]The transcript initially states "December 3, 2002"; however, later in the testimony, the date given is September 3, 2002. Thus, the initial reference to December appears to be a typographical error.

- 5 -

detectives and to the ASA. The newspaper article that Carrillo showed defendant indicated not only that Norfleet was under arrest but also that there was another suspect who was considered to be the "hit man."

¶ 23    On cross-examination, defendant's trial counsel asked: "[Defendant] was in custody on an unrelated charge. Did you try to contact his attorney for him?" Carrillo answered no. ASA Ward did inform defendant that this case was potentially a death penalty case.

¶ 24    The State rested, and the defense called Paul Bratonja, who testified that on August 27, 2002, he was employed as a police officer with the Milwaukee police department. However, he was on loan at that time to the United States Marshals Service and deputized as a United States marshal. On August 27, 2002, between 7 and 8 a.m., Bratonja and Deputy United States Marshal Patrick Amerson arrived at the Milwaukee county jail to pick up defendant, in response to a request from a lieutenant or captain in the Milwaukee Police Department to transport him to Chicago. Defendant was assisting a Milwaukee investigation and was expected to identify certain houses in Chicago. When they arrived, defendant stated that he did not want to go, and Bratonja said "that was fine with me." But then defendant asked if he would receive lunch. When Bratonja said yes, defendant agreed to go.

¶ 25    Bratonja testified that, during the ride, Bratonja stated that defendant was expected to identify certain addresses. As Amerson drove, defendant identified locations where certain drug transactions had occurred, and Bratonja wrote down the locations. Bratonja had been instructed that, after receiving information from defendant, the marshals were to go to Area 5 and transmit the information to Detective John Callaghan, which they did. As they drove, defendant was seated in the back of a prisoner van, shackled by his ankles, Bratonja was in the front passenger seat, and Amerson was driving. When they arrived at Area 5, Amerson remained in the van, and Bratonja went to the door of Area 5 and asked someone to contact Detective Callaghan. While they waited, the marshals opened the back door of the van so that defendant could smoke a cigarette, and both marshals stood immediately outside the open door. After Detective Callaghan came down, Bratonja provided him with the information, and then the marshals and defendant returned to Milwaukee. Bratonja later prepared a one-page report.

¶ 26    On cross-examination, Bratonja testified that there were no plans between his office and the Chicago Police Department to bring defendant to Chicago in August. The purpose of the trip was to assist the Milwaukee Police Department in its investigation of a murder in Milwaukee. Bratonja had no idea where to go in Chicago; defendant directed them. However, defendant had no addresses; he provided only intersections. Bratonja felt defendant took them on a "wild goose chase." Bratonja never spoke to Detective Callaghan prior to their arrival at Area 5, and Detective Callaghan did not interview defendant on that day. Defendant was never out of Bratonja's presence and never left the van. The entire time that they were at Area 5 was 20 minutes.

¶ 27    Defendant, age 32, testified that on September 3, 2002, he was in custody in Milwaukee on an unrelated charge and had been in custody since July 7, 2002. On the morning of September 3, he was transported from the Milwaukee county jail to a Milwaukee police station. At the jail, he had been told that he was going to speak with detectives about the Milwaukee case. However, at the police station, he was questioned by police officers and an ASA from Chicago. A Milwaukee police officer had placed him in a small, windowless room, and departed, leaving defendant alone in the room for 5 or 10 minutes. Defendant was not handcuffed at any point when he was in that room. After the Milwaukee officer departed, the

next people to enter were Detectives Carrillo and Callaghan, who asked if defendant remembered him. Defendant did remember Callaghan, having met him on August 27, 2002, at Area 5.

¶ 28 Defendant testified that, on August 27, 2002, the sheriffs at the Milwaukee county jail woke him up early and told him he had "traffic court." They took him to a room where two deputy marshals were waiting. The marshals asked him if he knew why they were there, and he said no. The marshals said that they had been advised that he was cooperating with the police on the Milwaukee case and that they were supposed to bring him to Chicago so that he could show them around. Defendant told them he was not "going anywhere with them." After he stated that, "[t]hey told me that they had been advised that I would. So I told them to let me talk to my lawyer." Then, "[t]hey had the sheriff take me back up stairs to my tier so I could get my lawyer's card and his number, and we came back with the card. I gave it to them. They said they attempted to call him, but he wasn't answering his phone." Defendant replied that he did not want to go without talking to his attorney. The marshals made another phone call and told defendant that they had talked to an ASA on his case in Milwaukee and that if defendant did not cooperate, they were "going to upgrade [the] charge." So defendant cooperated and came to Chicago with them.

¶ 29 Defendant testified that, as they drove to Chicago, he was in the back and the two marshals were in the front. After defendant directed them to certain places, they asked him if he knew the directions to Area 5, which he did. The marshal in the front passenger seat said he had a friend there whom he wanted to talk to. After arriving at Area 5, the marshal in the passenger seat exited the vehicle, made a call on his phone, reentered, and told the driver to drive around to the back of Area 5, which he did. The marshal in the passenger seat exited again and made a phone call, and Detective Callaghan came out. Defendant was able to observe Detective Callaghan through the windows of the van, as Callaghan exited Area 5 and spoke with the marshal who was standing outside the van. The marshal then opened up the sliding door at the back of the van, and Detective Callaghan introduced himself to defendant, and defendant asked him for a cigarette. Callaghan went back into the building and returned to give defendant a cigarette. Defendant did not enter Area 5, but he was able to observe his nephew, Larry Jones, in Area 5 because Jones was standing on a landing between floors and there were glass windows.

¶ 30 Defendant testified that Detective Callaghan walked away and the marshals closed the sliding door and reentered the van. Defendant asked them what his nephew was doing at Area 5 and pointed. The marshals asked him what he was talking about because they did not see anyone where he was pointing. They then drove back to Milwaukee.

¶ 31 Defendant testified that, on September 3, 2002, he was in an interrogation room in Milwaukee when Detectives Carrillo and Callaghan entered, and Callaghan asked if defendant remembered him. They did not read defendant his rights and started to question him about the Schultz murder. When they started to question him, defendant told them that he did not know what they were talking about, that he did not want to speak to them, and that he wanted to talk to his lawyer. The detectives told him that the lawyer from his Milwaukee case would not have anything to do with his Chicago case, and they continued to question him about the Schultz murder. At some point, defendant agreed to give them a statement because he was scared. He was scared because the detectives kept telling him he was going to receive the death penalty and this was his chance to help himself. They told him whether he cooperated with them was

- 7 -

going to determine whether he lived or died. If he did not cooperate, they were going to charge defendant's nephew, Larry Jones, and seek the death penalty against him. However, if defendant cooperated, they would leave his nephew out of the case.

¶ 32 Defendant testified that Detective Callaghan drew one box and wrote "live" over it and drew another box and wrote "die" over it, then asked defendant to choose one. The detectives also showed defendant a newspaper article that talked about the death penalty.

¶ 33 On cross-examination, defendant testified that in September 2002 he was 27 years old. When he met with ASA Ward, he understood that she was not his attorney. Ward did not try to trick him, and she did provide *Miranda* warnings prior to his videotaped statement. Defendant testified that the detectives did not provide *Miranda* warnings and he did not know if he had stated on the videotape that they had. Defendant understood that he could have an attorney present when he gave the videotaped statement. Defendant had been arrested before and had received *Miranda* warnings before. On July 8, 2002, he was arrested in Milwaukee for first degree murder, and the Milwaukee detectives had read him the *Miranda* warning on that charge. On October 7, 2001, he was arrested for possession of a firearm by a felon and received *Miranda* warnings by the Milwaukee police on that charge. As a result, defendant knew his *Miranda* rights, but he denied that his videotaped statement to ASA Ward on September 2, 2002, was voluntary.

¶ 34 Defendant testified that, prior to the videotaping, he read and signed a form stating that he was consenting to the videotaping, but that the statement itself was not voluntary. Defendant acknowledged that, during the videotaping, he did not complain of mistreatment by the police and did not ask for an attorney. In fact, he stated on the video that they treated him "pretty good." When asked on the videotape if he gave this statement freely and voluntarily, he answered yes. Defendant acknowledged that, on the videotape, he agreed that no threats or promises had been made. Defendant testified that he had an opportunity to speak with ASA Ward alone and he did not complain to her about not receiving an attorney. He did ask ASA Ward, if he cooperated and gave the statement that the detectives wanted, whether he would then not receive the death penalty. She said that she was not the ASA on the case, so that it was not "her call to make." Thus, defendant provided the videotaped statement knowing that the death penalty was still a possibility. With respect to the article the detectives showed him, defendant testified that he was in the article too and that their "purpose" was "to show" him "that this, in fact, was a case that [he] could get the death penalty on." Defendant testified that he gave the videotaped statement because he was scared of receiving the death penalty and it was a chance for him to help himself and his nephew avoid the death penalty.

¶ 35 During arguments on the motion, the State waived its opening statement and reserved its rebuttal argument. In the defense's argument, defendant's trial counsel emphasized defendant's fear of the death penalty, as corroborated by both the ASA and the detectives, and argued that threats and promises regarding both the death penalty and his nephew overbore defendant's will, rendering his statement involuntary. At the start of the State's rebuttal, the prosecutor directed the trial court's attention "to the allegations that are actually laid out in the motion" and went through the allegations, claim by claim. In response to defendant's claim that police interrogated him despite his request for counsel, the State cited the Illinois Supreme Court case of *Perry*, 147 Ill. 2d 430.

¶ 36 After hearing all the evidence and listening to arguments, the trial court denied the suppression motion "based on the credibility of the witnesses."

¶ 37    In defendant's initial *pro se* postconviction petition and his supplemental postconviction petition filed by counsel, defendant raised numerous claims, but he pursues only one claim on this appeal.

¶ 38    In his supplemental petition, defendant claims, with respect to the suppression motion, that trial counsel did not "clearly articulate" an *Edwards* claim. The petition observed that *Edwards* requires that, once a suspect invokes his fifth amendment right to counsel, all custodial interrogation must cease and it may resume only if counsel has been made available to the defendant or if the defendant initiates communication. *Edwards*, 451 U.S. at 484-85.

¶ 39    The trial court dismissed defendant's petitions, including the claim that defendant asserts on this appeal, finding that defendant's trial counsel "conducted a full" suppression "hearing during which he ably advocated on behalf of his client." The court found that defendant's trial counsel "vehemently argued that [defendant] was (1) coerced into making his statement; (2) not informed of his *Miranda* rights; and (3) interrogated after he had elected to remain silent and had elected to consult with an attorney prior to further questioning" and that counsel "cross-examined every single witness."

¶ 40    A timely notice of appeal was filed, and this appeal followed. For the following reasons, we affirm.

¶ 41                                    ANALYSIS

¶ 42                    I. Stages of Postconviction Proceedings

¶ 43    In the case at bar, defendant claims that the trial court erred by dismissing his postconviction petition at the second stage.

¶ 44    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)) provides a statutory remedy for criminal defendants who claim that their constitutional rights were violated. *People v. Edwards*, 2012 IL 111711, ¶ 21. The Act is not intended to be a substitute for a direct appeal; instead, it is a collateral proceeding, which attacks a final judgment. *Edwards*, 2012 IL 111711, ¶ 21.

¶ 45    The Act provides for three stages of review by the trial court. *People v. Domagala*, 2013 IL 113688, ¶ 32. At the first stage, the trial court may summarily dismiss a petition that is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2018); *Domagala*, 2013 IL 113688, ¶ 32. "[A] petition is frivolous or patently without merit only if it has no 'arguable basis either in law or in fact.' " *People v. Petrenko*, 237 Ill. 2d 490, 496 (2010) (quoting *People v. Hodges*, 234 Ill. 2d 1, 16 (2009)).

¶ 46    If a trial court does not dismiss a petition at the first stage, the petition then advances to the second stage, where counsel is appointed if a defendant is indigent. 725 ILCS 5/122-4 (West 2018); *Domagala*, 2013 IL 113688, ¶ 33. After counsel determines whether to amend the petition, the State may file either a motion to dismiss or file an answer to the petition. 725 ILCS 5/122-5 (West 2018); *Domagala*, 2013 IL 113688, ¶ 33. At the second stage, the trial court must determine "whether the petition and any accompanying documentation make a substantial showing of a constitutional violation." *People v. Edwards*, 197 Ill. 2d 239, 246 (2001).

¶ 47    If the defendant makes a "substantial showing" at the second stage, then the petition advances to a third-stage evidentiary hearing. *Domagala*, 2013 IL 113688, ¶ 34. At a third-stage evidentiary hearing, the trial court acts as a factfinder in determining witness credibility,

the weight to be given particular testimony and evidence, and the resolution of any evidentiary conflicts. *Domagala*, 2013 IL 113688, ¶ 34.

¶ 48 When a matter is decided without an evidentiary hearing, as it was in this case, we review the trial court's decision under a *de novo* standard of review. See *People v. Hommerson*, 2014 IL 115638, ¶ 6 (first-stage summary dismissal); *People v. Tyler*, 2015 IL App (1st) 123470, ¶ 151 (second-stage dismissal (citing *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006))). Under a *de novo* standard, the reviewing court owes no deference to the trial court's judgment or reasoning. *Tyler*, 2015 IL App (1st) 123470, ¶ 151. *De novo* consideration means that the reviewing court performs the same analysis that a trial judge would perform. *Tyler*, 2015 IL App (1st) 123470, ¶ 151.

¶ 49 In addition, a reviewing court may affirm on any basis found in the record. *In re Gabriel W.*, 2017 IL App (1st) 172120, ¶ 31; *People v. Miles*, 2017 IL App (1st) 132719, ¶ 22; *People v. Daniel*, 2013 IL App (1st) 111876, ¶ 37 ("we may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct").

¶ 50                                         II. Ineffective Assistance of Counsel

¶ 51 Defendant asserts two layers of ineffective assistance of counsel—ineffectiveness by both his trial counsel and his counsel on direct appeal.

¶ 52 Every Illinois defendant has a constitutional right to the effective assistance of counsel under the sixth amendment to the United States Constitution and article I, section 8, of the Illinois Constitution. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *Domagala*, 2013 IL 113688, ¶ 36.

¶ 53 The Illinois Supreme Court has found that, to determine whether a defendant was denied his or her right to effective assistance of counsel, an appellate court must apply the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Domagala*, 2013 IL 113688, ¶ 36 (citing *People v. Albanese*, 104 Ill. 2d 504, 526 (1984) (adopting *Strickland* for Illinois)); *People v. Colon*, 225 Ill. 2d 125, 135 (2007) (also citing *Albanese*). Under *Strickland*, a defendant must prove both (1) that his attorney's actions constituted errors so serious as to fall below an objective standard of reasonableness and (2) that, absent these errors, there was a reasonable probability that his trial would have resulted in a different outcome. *Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland*, 466 U.S. at 694); *People v. Ward*, 371 Ill. App. 3d 382, 434 (2007) (also citing *Strickland*).

¶ 54 "The *Strickland* standard applies equally" to claims concerning trial and appellate counsel. *Petrenko*, 237 Ill. 2d at 497. A defendant raising a claim concerning appellate counsel "must show both that appellate counsel's performance was deficient and that, but for counsel's errors, there is a reasonable probability that the appeal would have been successful." *Petrenko*, 237 Ill. 2d at 497. If a postconviction petition claims that appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness, a reviewing court must first consider whether the claim of trial counsel's ineffectiveness would have succeeded on direct appeal. See *Petrenko*, 237 Ill. 2d at 501-52. If the underlying claim would not have succeeded on direct appeal, then "there is no arguable legal basis" for defendant's claim of ineffective assistance of appellate counsel, and "summary dismissal of his *pro se* postconviction [petition]" is "proper." *Petrenko*, 237 Ill. 2d at 501-02.

¶ 55     At the second stage of proceedings under the Act, a petition alleging ineffective assistance of counsel must make (1) a substantial showing that counsel's performance fell below an objective standard of reasonableness and (2) a substantial showing that the defendant was prejudiced. See *Edwards*, 197 Ill. 2d at 246; *Petrenko*, 237 Ill. 2d at 497 (citing *Hodges*, 234 Ill. 2d at 17).

¶ 56     To prevail, a defendant must satisfy *both* prongs of the *Strickland* test. *Colon*, 225 Ill. 2d at 135; *People v. Evans*, 209 Ill. 2d 194, 220 (2004). That means that, if an ineffective-assistance claim can be disposed of because the defendant cannot satisfy one prong, we need not determine the remaining prong. *People v. Graham*, 206 Ill. 2d 465, 476 (2003). In the case at bar, we do not need to consider the second prong of the *Strickland* test since the first prong is not satisfied. See *Graham*, 206 Ill. 2d at 476.

¶ 57                                         III. Trial Strategy

¶ 58     To establish the first prong, a defendant must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy. *People v. Manning*, 241 Ill. 2d 319, 327 (2011); *People v. Banks*, 2016 IL App (1st) 131009, ¶ 123. Matters of trial strategy are generally immune from claims of ineffective assistance of counsel. *Manning*, 241 Ill. 2d at 327; *Banks*, 2016 IL App (1st) 131009, ¶ 123.

¶ 59     "[E]ffective assistance of counsel refers to competent, not perfect, representation." *People v. Palmer*, 162 Ill. 2d 465, 476 (1994); *People v. Stewart*, 104 Ill. 2d 463, 491-92 (1984). Since a defendant is "entitled to reasonable, not perfect, representation," "mistakes in strategy or in judgment do not, of themselves, render the representation incompetent." *People v. Fuller*, 205 Ill. 2d 308, 331 (2002). A defendant must overcome "the strong presumption that counsel's performance fell within [the] wide range of reasonable professional assistance." *Palmer*, 162 Ill. 2d at 476.

¶ 60     Although an argument by counsel may not ultimately succeed, selecting which issues to argue is generally viewed as "the result of considered trial strategy and thus immune from an ineffectiveness claim." *People v. Trice*, 2017 IL App (1st) 152090, ¶ 69; see also *People v. Edmondson*, 2018 IL App (1st) 151381, ¶ 36 (a counsel's tactical decisions in her closing presentation are at the quintessential heart of trial strategy).

¶ 61     On this appeal, defendant claims that his trial counsel did not clearly articulate an *Edwards* claim that police interrogated defendant after he had asserted his right to counsel. In *Edwards*, the United States Supreme Court "h[e]ld that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards*, 451 U.S. at 484. The Court "further h[e]ld that an accused, *** having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversation with the police." *Edwards*, 451 U.S. at 484-85.

¶ 62     Defendant argues pursuant to *Edwards* that, once he asserted his right to counsel on August 27, 2002, to the United States marshals, all police-initiated custodial interrogation had to cease

until counsel was made available to him. See *People v. Lira*, 318 Ill. App. 3d 118, 126 (2001).[3] Defendant argues that his trial counsel was ineffective for failing to "clearly articulate" and pursue this claim.

¶ 63 It is stating the obvious to observe that, for *Edwards* to require suppression, there must first be a factual finding that the defendant, in fact, invoked his right to counsel. *E.g.*, *Lira*, 318 Ill. App. 3d at 124 (the appellate court found that it was not against the manifest weight of the evidence for the trial court to find that the defendant invoked his fifth amendment right to counsel). At the suppression hearing, defendant testified that he asked to speak to his counsel on August 27, 2002, when the marshals arrived to transport him from Milwaukee to Chicago for the day. He claims that it was his desire to talk to his attorney that caused him to balk, initially, at traveling with the marshals to Chicago. However, contrary to defendant's testimony, one of the marshals testified that, once defendant heard he would receive lunch, he agreed to go. Defendant does not explain why, if the trial court was not persuaded by his testimony about repeated rights violations, it was ineffective of counsel not to forcefully argue this particular one.

¶ 64 In the case at bar, defendant's trial counsel did claim in a pretrial suppression motion that police interrogated defendant after he had asserted his right to counsel in violation of his fifth amendment rights. At the suppression hearing, defendant testified repeatedly that he had asserted his right to counsel, both on August 27, 2002, when the marshals arrived in Milwaukee to bring him to Chicago, and on September 3, 2002, when Detectives Carrillo and Callaghan arrived in Milwaukee to interview him about the Schultz murder. At the conclusion of the suppression hearing, during arguments, the State cited an Illinois case that discussed *Edwards*. In its ruling on defendant's pretrial motion, the trial court denied the motion based on the witnesses' respective credibility and resolved all factual conflicts in the State's favor. The fact that defendant's trial counsel did not specifically cite *Edwards* in the pretrial motion is not dispositive, particularly where he made sure that the claim was set forth during defendant's suppression testimony. The fact that trial counsel chose not to respond to a specific case cited by the State and chose to emphasize other points during argument was a matter of trial strategy that is immune from an ineffectiveness claim. See *Edmondson*, 2018 IL App (1st) 151381, ¶ 36; *Trice*, 2017 IL App (1st) 152090, ¶ 69. At the suppression hearing, the State waived its initial argument, thereby forcing the defense to argue first, without knowing what the State would argue. Defense counsel could have asked the trial court for an opportunity to respond but chose not to. Again, this was a strategic choice. The fact that the trial court did not address each claim when denying defendant's motion does not mean that the matter was not fully litigated. Defendant claimed in his testimony that he asserted his right to counsel; and the trial court simply found him, overall, not credible.

¶ 65 In sum, we cannot find trial counsel ineffective for failing to raise a claim that was, in fact, raised, and we cannot find appellate counsel ineffective for the same reason.

---

[3]In *Lira*, the knowledge by Iowa police of a defendant's invocation of his right to counsel was imputed to an Illinois police officer where the Illinois police officer was aware that defendant was being held in Iowa for an Iowa offense and, thus, had reason to expect that the defendant might have invoked his right to counsel during an Iowa police interrogation. *Lira*, 318 Ill. App. 3d at 126.

¶ 66                              CONCLUSION

¶ 67       For the foregoing reasons, we affirm the trial court's second-stage dismissal of defendant's postconviction petition.

¶ 68       Affirmed.