2022 IL App (1st) 211170-U

No. 1-21-1170

Order filed December 19, 2022.

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 04 CR 15038 |
| | ) | |
| ELRON CATHEY, | ) | The Honorable |
| | ) | Angela Munari-Petrone, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE LAVIN delivered the judgment of the court.
Justices Pucinski and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's postconviction petition was properly dismissed at the second stage, where defendant failed to make a substantial showing of ineffective assistance of trial counsel for purportedly failing to investigate and call an individual to testify, who did not witness the shooting.

¶ 2    Defendant Elron Cathey appeals from the circuit court's second-stage dismissal of his supplemental postconviction petition filed pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)). On appeal, defendant argues the circuit court erred in

dismissing his petition, as he made a substantial showing that trial counsel provided ineffective assistance by failing to investigate and call a witness who would have corroborated his defense. We affirm.

¶ 3     Defendant was charged by indictment with six offenses in connection with the shooting of Maurice Sterling in Chicago on June 8, 2004. The State proceeded to trial on one count each of attempted first degree murder and aggravated battery with a firearm, and nol-prossed the remaining counts. Following a 2006 jury trial, defendant was found guilty of aggravated battery with a firearm and sentenced to 40 years in prison. We affirmed on direct appeal. *People v. Cathey*, No. 1-06-0460 (2007) (unpublished order under Illinois Supreme Court Rule 23). We summarize the trial testimony necessary to address the issue on appeal.

¶ 4     At trial, Xavier Finley testified that on June 8, 2004, at about 10 p.m., he was sitting on a porch with friends on 84th Street and Colfax Avenue when  he saw defendant and three other people approach.[1] Xavier ran when he saw defendant and called his brother Brian Finley, asking Brian to pick him up on Colfax. Xavier did not remain on Colfax and did not see Brian until he went home near, 84th and Crandon Avenue. At home, Xavier saw police vehicles and Sterling, who had been shot and was in a black Chevrolet Impala.

¶ 5     On cross-examination, Xavier testified that he did not tell his brother anyone was "trying to get [him]." Rather, he said "Elron is out there, come and get me on Colfax."

¶ 6     Brian testified that at about 10:20 or 10:30 p.m. that night, he was at a friend's house and received a frantic phone call from Xavier. After they spoke, Brian immediately went home to 84th

---

[1] Because the witnesses Xavier and Brian Finley share the same last name, we refer to them by their first names.

and Crandon and got in his mother's vehicle. He called and picked up Sterling, and drove to Colfax and Kingston Street. As Brian drove down Kingston toward 85th Street, he saw defendant on the left side of the street with a group of teenagers. Brian turned the corner, parked his vehicle, and exited on foot.

¶ 7    Brian asked defendant where Xavier was, and defendant responded, " 'What the f***.' " Sterling, who had exited the vehicle, said, " 'You heard what he said.' " Brian saw the group of teenagers who were with defendant start moving, and one of them handed defendant a "real big," black object, which defendant held with both hands. Sterling yelled, " 'He got a gun.' " Sterling and Brian turned around and ran back to the vehicle. Brian reached the driver's side of the vehicle, and Sterling reached the passenger's side door, which was open. Brian heard a "loud 'pow' " and Sterling's body "jerked" at the same time, falling into the vehicle. Brian pulled Sterling fully into the vehicle and drove about eight blocks to his home.

¶ 8    At home, Brian's mother called the police. When the police arrived, Brian stated that defendant shot Sterling on Kingston. A detective drove Brian to defendant's house, where Brian identified defendant as the shooter.

¶ 9    Brian confirmed that a series of photographs depicted his mother's vehicle after the shooting. Brian stated that blood was visible on the steering wheel, driver's and passenger's seats, dashboard, and console. He also stated that a photograph showed a cracked windshield that was not present before the shooting.

¶ 10    On cross-examination, Brian confirmed he did not call the police after Xavier told Brian that defendant was trying to kill him. After Brian drove his mother's black Impala to pick up Sterling, he did not drive to where Xavier told him to go. Rather, Brian turned down Kingston,

toward defendant's house. Once Brian saw defendant, he stopped the vehicle, exited, and approached defendant to talk to him. Defendant was in a group of about five people. Sterling used a confrontational tone when he told defendant, " 'You heard what he said.' " Brian initially told police he was driving home down 86th, heard a gunshot, and realized Sterling had been hit. He eventually changed his story and stated he had exited the vehicle to confront defendant before defendant shot at him and Sterling.

¶ 11    On redirect examination, Brian stated neither he nor Sterling had a firearm that night.

¶ 12    Sterling testified that on June 8, 2004, he was shot in the head while he was with Brian, but he did not remember anything about the incident. Sterling indicated in court that he had a scar from his operation going from the middle of his forehead to his left ear.

¶ 13    Police forensic investigator Carl Brasic testified that he responded to Brian's home at 11:30 p.m. and photographed the damage to the black Impala. He observed that the vehicle had "apparent bullet damage" to the passenger's side windshield and a "large quantity of blood" in the interior. Brasic did not find ballistic evidence in the vehicle. Brasic performed a gunshot residue test on Brian and defendant, and the test kits were inventoried.

¶ 14    On cross-examination, Brasic explained that a bullet striking a vehicle's window "makes damage particularly looking like" the crack on the Impala's windshield. He stated that it would be "very highly unusual" for a hard object hitting the windshield to cause that damage.

¶ 15    Chicago police officer Robert Garcia testified that he and his partner Officer Anthony Rotkvich drove to the 8600 block of Kingston, and saw defendant seated in a chair in front of a residence. Garcia noticed defendant was sweating "profusely" and handcuffed him. Other officers arrived with Brian, and Brian identified defendant as the shooter. Garcia Mirandized and

questioned defendant. During the questioning, defendant stated, " 'You got to do what you got to do.' " Garcia and Rotkvich searched the area of defendant's residence and recovered a live .45-caliber cartridge from the windowsill in the gangway, which was inventoried.

¶ 16    On cross-examination, Garcia testified that a firearm was not found at the scene of the shooting.

¶ 17    Chicago police forensic scientist Deborah McGarry testified that the inventoried live cartridge had no latent impressions suitable for comparison. On cross-examination, McGarry confirmed that sweat can contribute to leaving a latent print, and a bullet is a good surface for leaving prints because it is smooth.

¶ 18    Illinois State Police trace evidence analyst Robert Berk testified that he examined the gunshot residue kits collected from Brian and defendant. He could not detect any unique particles of gunshot residue on the samples collected from Brian and concluded the results were negative. As to defendant's gunshot residue kit, two unique particles of gunshot residue were found on the sample from his right hand, which fell short of the three-particle requirement for a "positive finding." However, six unique particles of gunshot residue were detected on the sample from defendant's left hand, which was sufficient for a positive finding. Berk opined, based on a reasonable degree of scientific certainty, that defendant either discharged a firearm, contacted an item with primer gunshot residue on it, or was in the environment of a firearm when it was discharged.

¶ 19    On cross-examination, Berk testified there was a possibility that someone could be exposed to gunshot residue but return results that were not positive in a gunshot residue kit.

¶ 20     Defendant testified on his own behalf. He stated that on June 8, 2004, between 10:20 and 10:30 p.m., he was walking home on 85th and Kingston. A black vehicle drove up to him, and a man said something inaudible. The vehicle turned a corner, and two men jumped out. Defendant did not know them at the time, but later learned they were Brian and Sterling. Brian "was just talking crazy," saying "somebody is trying to do something to his brother." Defendant knew "nothing about that" and did not know Brian's brother. Defendant responded, " 'Man, what the f***?' " Brian then removed a black revolver from the small of his back with his left hand and had his finger on the trigger. Brian approached him and said, " 'Don't run.' " The two wrestled. Defendant got behind Brian with his left hand on top of Brian's left hand, which was holding the firearm with his finger on the trigger. They spun 180 degrees around, and the firearm "went off." Defendant pushed Brian and ran the approximate half block home.

¶ 21     After going inside his house, defendant returned outside and sat down in a chair. Police officers approached defendant and they talked. Defendant told them he had an "altercation with somebody on the corner." The officers told him someone was shot, but defendant did not believe them and thought the officers were "trying to *** get [him] on something else." Defendant professed self-defense to the officers "throughout the entire process."

¶ 22     On cross-examination, defendant testified that during his struggle with Brian, he was wrestling for the firearm and holding it, but the firearm was still in Brian's hand when it went off. After that, defendant ran. He told the first police officer at the scene that he did not have a firearm and did not shoot anyone. Once the police "explained the situation," he still did not believe anyone was shot.

¶ 23   James Johnson testified that on the night of the incident at about 10:30 p.m., he and his cousin sat on the steps of his aunt's porch, near the intersection of 86th and Kingston. A black Impala stopped on 86th, two or three men exited, and people argued near the street corner four or five houses down from Johnson. There was a physical struggle and then a firearm "went off." Johnson could not hear what the people were saying, and the argument lasted about 7 to 10 seconds before the physical altercation began. He did not see a firearm and ran inside the house with his cousin after he heard the gunshot.

¶ 24   The State called Garcia again in rebuttal. Garcia testified that when he spoke with defendant at his home, defendant never stated that he had an altercation down the street and a firearm went off.

¶ 25   In closing argument, defense counsel argued that Brian picked up Sterling because Sterling had a firearm, and Brian then went to defendant's location with the intent to "do *** harm." At the scene of the shooting, Brian approached defendant with a handgun, and defendant wrestled for the handgun out of self-defense while Brian's finger was on the trigger. The handgun went off in the process.

¶ 26   The jury found defendant guilty of aggravated battery with a firearm and acquitted him of attempted first degree murder. The trial court sentenced defendant to 40 years in prison.

¶ 27   We affirmed on direct appeal, over defendant's contentions that the evidence was not sufficient to support his conviction where Brian, the State's main witness, was materially impeached, the trial court improperly admitted his prior conviction for aggravated battery with a firearm, and his enhanced sentence was inappropriate and excessive. *Cathey*, No. 1-06-0460 (2007) (unpublished order under Illinois Supreme Court Rule 23).

¶ 28    In 2008, defendant filed his initial *pro se* postconviction petition. On December 2, 2008, the circuit court summarily dismissed the petition. We affirmed. *People v. Cathey*, 406 Ill. App. 3d 503, 509-10 (2010). The supreme court reversed, finding defendant stated an arguable claim that counsel on direct appeal provided ineffective assistance by failing to argue that the trial court erred when it delayed ruling on his motion *in limine* to exclude evidence of his prior convictions, and remanded for second-stage proceedings. *People v. Cathey*, 2012 IL 111746, ¶ 32.

¶ 29    On remand, defendant filed a supplemental postconviction petition through appointed counsel. The petition alleged, in relevant part, that trial counsel provided ineffective assistance by failing to investigate a witness named Kendro Earl, who would have testified that he was with Xavier and Brian on the night of the incident and saw Brian with a handgun before the confrontation with defendant. Defendant alleged that trial counsel knew of Earl, citing Xavier's grand jury testimony that Xavier was with Earl prior to the incident. Defendant asserted that had trial counsel investigated Earl, his defense theory that Brian and Sterling were the ones who brought the firearm to the scene would have been corroborated by Earl. Defendant argued that "with the case being this closely balanced, and the State only presenting one actual eyewitness to the events," counsel provided ineffective assistance by not investigating Earl. Defendant requested the circuit court to set an evidentiary hearing or grant him a new trial.

¶ 30    Attached was the affidavit of Earl, who averred that he waived his "fifth amendment [right] to remain silent." According to Earl, there was an ongoing "quarrel" between Brian and defendant's friend, Aaron Patterson, who had told Xavier and Brian they could no longer sell drugs in the neighborhood.

¶ 31    Earl averred that on June 8, 2004, "sometime after 9:50 pm," he was with Xavier on 84th and Essex Avenue. As they walked toward a house on the 8500 block of Kingston where Xavier wanted to go, Xavier saw defendant talking to two women, one named Dee-Dee, outside of the house. Xavier called Brian because "he thought he would have trouble applying his trade" while defendant was outside. Xavier told Brian he would meet him in front of a house on the 8400 block of Kingston. When Brian drove up in his green "cutles," Xavier and Earl approached the vehicle. Earl saw that Brian had a black handgun in his lap.

¶ 32    Xavier told Brian exactly where defendant was located. Brian then said he would get another vehicle and "someone else just in case he had to get him in front of Dee-Dee's house," since Dee-Dee would recognize him and his vehicle. Xavier got in Brian's vehicle. Earl went back to 84th and Essex because he "wanted no part of such a plan." Earl averred that he had not come forward with the information "back then" because of his friendship with Xavier and Brian, and because he "didn't witness the shooting." He averred that he was not interviewed by police or defendant's attorney and was "not an eyewitness," but "could have more well informed the [parties] in this case of fact[s] and circumstances of the case."

¶ 33    Also attached to the supplemental petition was a portion of the transcript from Xavier's grand jury testimony where he stated that, on the afternoon of the shooting, he was with his friends "Paul, Devon, Harold and [Earl]" sitting on a porch at 84th and Colfax when defendant and three "boys" approached. Xavier and his companions ran away.

¶ 34    On September 6, 2019, the State filed a motion to dismiss defendant's postconviction petition, arguing, in relevant part, that defendant's claim must fail because Earl's affidavit was legally deficient. The State explained Earl acknowledged he was not an eyewitness to the incident

and did not aver that he would have been willing to testify in court at defendant's trial. The State noted Earl's concession that he was unwilling to come forward because of his friendship with Xavier and Brian, which rebutted any claim that Earl was willing to be interviewed. Additionally, the State argued that defendant failed to show prejudice by demonstrating he would have been found not guilty in light of Earl's affidavit. The State reasoned that, regardless of whether one accepted defendant's testimony that Brian produced the firearm or the testimony from the State's witnesses that defendant produced the firearm, defendant was either the actual shooter or legally responsible for the firearm's discharge.

¶ 35    Subsequently, defendant filed a *pro se* "successive post-conviction petition" and *pro se* "supplemental petition for successive post-conviction."

¶ 36    On January 26, 2021, the State filed a "combined amended motion to dismiss and reply to petitioner's post conviction petition," reiterating that Earl's affidavit was legally deficient and could not serve as a basis for an ineffective assistance of counsel claim.

¶ 37    On September 1, 2021, the circuit court granted the State's motion and amended motion to dismiss as to all postconviction claims filed to date. Relevant here, the court found that defendant failed to show there was a reasonable probability Earl's testimony would have led to a different outcome, where Earl averred that he did not see the shooting, and the jury heard and rejected defendant's self-defense claim. Defendant timely appealed.

¶ 38    On appeal, defendant argues the circuit court erred in dismissing his petition at the second stage of proceedings, as he made a substantial showing that trial counsel provided ineffective assistance by failing to investigate and call Earl, who would have corroborated his defense that Brian confronted him while armed with a firearm.

¶ 39 The Act provides a three-stage method for a criminal defendant to challenge his or her conviction or sentence for violation of federal or state constitutional rights. *People v. Knapp*, 2020 IL 124992, ¶ 43. Defendant's petition was dismissed at the second stage of proceedings, where counsel is appointed to represent the defendant if necessary, and the State is permitted to file responsive pleadings. *People v. House*, 2021 IL 125124, ¶ 17. At the second stage of postconviction proceedings, the circuit court must determine whether to grant the State's motion to dismiss the petition or advance the petition to the third stage for an evidentiary hearing. *People v. Dupree*, 2018 IL 122307, ¶ 28. A postconviction petitioner is only entitled to a third-stage evidentiary hearing where "the allegations in the petition supported by affidavits, records, or other evidence [citation] make a substantial showing" of a deprivation of constitutional rights. (Internal quotation marks omitted.) *Id.* We must take as true all well-pleaded facts not positively rebutted by the original trial record. *People v. Domagala*, 2013 IL 113688, ¶ 35. The second stage of postconviction review tests the legal sufficiency of the petition. *Id.*

¶ 40 "[T]he inquiry into whether a post-conviction petition contains sufficient allegations of constitutional deprivations does not require the circuit court to engage in any fact-finding or credibility determinations," as such determinations are made during the evidentiary third stage of postconviction proceedings. (Internal quotation marks omitted.) *Dupree*, 2018 IL 122307, ¶ 29. "An evidentiary hearing is only required when the allegations of the petition, supported by the trial record and accompanying affidavits, make a substantial showing of a violation of a constitutional right." *People v. Flowers*, 2015 IL App (1st) 113259, ¶ 31. We review *de novo* the circuit court's second-stage dismissal of a postconviction petition. *Dupree*, 2018 IL 122307, ¶ 29.

¶ 41    In his petition, defendant argued he was denied his right to effective assistance of trial counsel. Under the sixth amendment to the United States Constitution (U.S. Const., amend. VI), a criminal defendant is guaranteed the right to effective assistance of counsel. *People v. Cole*, 2017 IL 120997, ¶ 22. To prevail on a claim of ineffective assistance under *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant must demonstrate both "that counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense." (Internal quotation marks omitted.) *People v. Tate*, 2012 IL 112214, ¶ 19.

¶ 42    During second-stage postconviction proceedings, the defendant must make "(1) a substantial showing that counsel's performance was objectively unreasonable under prevailing professional norms and (2) a substantial showing that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *People v. White*, 2021 IL App (1st) 170903, ¶ 35. A defendant must satisfy both prongs of the *Strickland* test to prevail on an ineffective assistance of counsel claim. *People v. Johnson*, 2019 IL App (1st) 162999, ¶ 56.

¶ 43    We need consider only the prejudice prong here as defendant has not made a substantial showing he was prejudiced by counsel's purported failure to investigate Earl as a witness and call him to testify. Prejudice may be found "even when the chance that minimally competent counsel would have won an acquittal is significantly less than 50 percent, as long as a verdict of not guilty would be reasonable." (Internal quotation marks omitted.) *People v. McCarter*, 385 Ill. App. 3d 919, 935 (2008). Here, the allegations in defendant's petition and Earl's proffered testimony fail to show a reasonable probability that the outcome of the proceeding would have been different had his counsel called Earl to testify.

¶ 44    If Earl testified in accordance with his affidavit, he would have recounted his observations that Brian had a firearm at a time prior to the shooting and at a location different from the shooting. Earl avers he was not an eyewitness to the shooting. Thus, if called, he could not have corroborated defendant's testimony regarding how the shooting occurred. See *e.g.*, *People v. Lee*, 2016 IL App (1st) 152425, ¶¶ 66, 68 (the defendant failed to show he suffered prejudice from trial counsel's failure to call a witness, where the "main problem" with the witness's affidavits was that "his observations occurred after the offense concluded"). While Earl's proffered testimony would have corroborated the defense's theory of the case that Brian possessed a firearm, it could not corroborate that Brian arrived at the scene armed with a firearm, let alone that Brian pulled the firearm out and threatened defendant with it as defendant testified. In fact, Earl could not corroborate either version of how the shooting occurred as he was not there. Taking the allegations in defendant's petition and Earl's affidavit as true, defendant failed to show a reasonable probability that the result of the proceeding would have been different had trial counsel investigated and introduced Earl's proffered testimony. See *People v. Colon*, 225 Ill. 2d 125, 135 (2007).

¶ 45    Nevertheless, defendant characterizes the evidence in this case as closely balanced and argues there was a reasonable probability that Earl's proffered testimony would have changed the outcome of the case. The record, however, demonstrates otherwise. The evidence at defendant's jury trial established that, at the scene of the shooting, defendant was handed a firearm and shot Sterling in the head after Sterling turned and ran toward the black Impala. The black Impala had "apparent bullet damage" in the passenger's side windshield and blood in its interior, but there was

no blood elsewhere at the scene. No firearm was recovered at the scene, and a live cartridge was found on a windowsill in the gangway adjoined to defendant's house.

¶ 46    Even further, defendant initially did not mention having an altercation when he spoke with a responding police officer, despite asserting he acted in self-defense. This evidence consistently showed that defendant intentionally shot Sterling, which Earl's proffered testimony would not have contradicted. Based on this record, the statements in Earl's affidavit would do little to challenge the trial evidence that defendant shot Sterling in the head as he ran toward the black Impala, which was corroborated by the physical evidence, and not from a struggle over the firearm with Brian. See *People v. Brown*, 2015 IL App (1st) 122940, ¶ 61 (the defendant failed to show prejudice due to the failure to call a witness, where the proposed witness's testimony would have added nothing to the case, and the witness could not say either way whether the defendant had a firearm). Defendant therefore cannot show he was prejudiced from trial counsel's purported failure to investigate and call Earl premised on a claim that the outcome of the proceeding would have been different.

¶ 47    Thus, defendant has failed to establish the prejudice prong of the *Strickland* test, as is required for him to prevail on an ineffective assistance claim. *Johnson*, 2019 IL App (1st) 162999, ¶ 56. We therefore find the allegations in defendant's petition and accompanying documents, most significantly Earl's affidavit, fail to make a substantial showing of a constitutional violation premised on the ineffective assistance of trial counsel. The circuit court properly dismissed defendant's supplemental petition at the second stage of postconviction proceedings.

¶ 48    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 49    Affirmed.