2022 IL App (2d) 200173-U
No. 2-20-0173
Order filed May 26, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of De Kalb County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 05-CF-289 |
| KIRK B. SWAGGERTY, | ) ) ) | Honorable Robin J. Stuckert, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE BRIDGES delivered the judgment of the court.
Justices Hutchinson and Zenoff concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The trial court did not err in granting the State's motion to dismiss defendant's postconviction petition, as defendant failed to make a substantial showing of ineffective assistance of counsel. Therefore, we affirm.

¶ 2   Defendant, Kirk B. Swaggerty, appeals from the trial court's second-stage dismissal of his postconviction petition. Defendant argues that his petition should have advanced to the third stage of proceedings because he made a substantial showing that his trial counsel was ineffective for not objecting to the prosecutor's repeated, improper comments about his co-defendants' guilt and

punishment, and that his subsequent attorneys were ineffective for failing to preserve this issue for review. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Defendant was charged with first-degree murder (720 ILCS 5/9-1(a)(3) (West 2004)), home invasion (720 ILCS 5/12-11(a)(3) (West 2004)), and unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a)(1) (West 2004)) for an incident that took place on February 4, 2005, at the home of marijuana supplier Michael Mason and his girlfriend, Amy Crosby. The State's theory of the case was that defendant planned a home invasion at Mason's residence, which was carried out by Michael Kappa and Jason Middlekauff. Jaime Villareal acted as the getaway driver. Middlekauff brought a gun with him to Mason's house, which Mason was able to obtain after a struggle, and Mason used the gun to shoot Kappa and Middlekauff, resulting in Kappa's death. Defendant was not present at the home, but the State alleged that he was guilty of Kappa's death and the other charges through accountability.

¶ 5     During opening statements, the State argued:

        "Ultimately you're going to hear how the people involved in this case have been charged and convicted with various crimes in connection with the events of February 4, 2005. Michael Mason was charged and convicted. Jason Middlekauff was charged and convicted. Jaime Villarreal was charged and convicted.

        This is a case with a lot of guilty people, but the evidence will show that there is one more guilty party and he sits right there."

¶ 6     We restate the testimony as summarized in defendant's prior appeal. See *People v. Swaggerty*, 2015 IL App (2d) 140854-U. Mason testified that, as of February 2005, defendant had a friendly relationship with him and had been buying marijuana in bulk from him for about six

months. Mason's practice was to advance the marijuana without requiring payment at the time of delivery, but to require payment before advancing more marijuana. As of that February, defendant had been unable to make payment for marijuana he had already received. On February 3, 2005, Mason received a shipment of somewhat more than 100 pounds of what he deemed to be exceptionally high-quality marijuana. He invited defendant to come examine it, intending to give defendant a large sample that he could use to generate sales and pay off his debt. Defendant was the only one who knew that the marijuana was at Mason's house; Mason did not usually keep his stock at home. Defendant came, he saw the marijuana in Mason's basement, and the two negotiated how much Mason would advance, with defendant wanting more than Mason was willing to provide.

¶ 7    Mason and Crosby gave largely consistent descriptions of what happened the next night at about 10 p.m. According to Mason, Mason was at his house in Genoa with Crosby and the couple's two children. Someone knocked at the door and yelled, alarming Mason to the extent that he armed himself with a nearby samurai sword.

¶ 8    Someone kicked down the door, and Kappa and Middlekauff[1] entered. Middlekauff threatened Mason with a handgun while Kappa ran up the stairs. Mason put down the sword on Middlekauff's order. He and Middlekauff then struggled over the gun as Middlekauff tried to restrain him with duct tape. Middlekauff yelled for help, and Kappa returned. Kappa was initially unarmed and struck at Mason, but then picked up the sword from where Mason had left it. Mason

---

[1] Middlekauff's last name is spelled as "Middlekauf" in the prior appeal, but he testified at trial that his name was spelled "Middlekauff." We have corrected the spelling in restating the facts.

got control of the gun and shot Middlekauff in the stomach. Middlekauff remained on his feet. Kappa threatened Mason with the sword, and Mason shot Kappa several times, disabling him.

¶ 9　　Mason told Middlekauff to get out and take Kappa with him. Middlekauff said that he was too injured to move Kappa; he suggested that he could get the driver outside to help. He went out to the vehicle but did not come back. The vehicle, a conversion van, drove away, leaving Kappa lying on the floor of Mason's house. Mason told Crosby to call 911, which she did. The police and paramedics arrived.

¶ 10　　Villarreal's testimony was also consistent concerning the events at Mason's house. He described riding in the van to Mason's house with Middlekauff and Kappa, but staying outside until Middlekauff emerged alone and bleeding from a gunshot wound.

¶ 11　　Villarreal further testified that defendant had suggested robbing Mason and had told the others that Mason had a great deal of marijuana and cash at his house. Defendant had also participated directly in preparations for the planned robbery. In particular, the afternoon before the planned robbery, Villarreal and defendant went to a hardware store and purchased gloves and duct tape.

¶ 12　　Villarreal further testified that defendant had met with Kappa, Middlekauff, and Villarreal in Genoa and watched them drive away to Mason's house. As Villarreal and Middlekauff drove away from Mason's house, Villarreal made a call to defendant, who was waiting in a parking lot when they came back. Villarreal called 911 to get aid for Middlekauff, and then he and defendant drove away in defendant's car. He and defendant then fled to Mexico; defendant remained there after Villarreal returned home.

¶ 13    Finally, Villarreal testified that he first saw the gun that Middlekauff had carried when he watched someone—Villarreal could not recall whom—loading the gun with ammunition taken from a safe in defendant's garage.

¶ 14    Middlekauff also testified. He said that he was mostly unable to remember the incident and the time surrounding it. However, he agreed that his statements to the police at the time of the incident correctly reflected what he remembered at the time. Those statements were largely consistent with Villarreal's testimony.

¶ 15    Jesus Paz also gave testimony consistent with Villarreal's. Villarreal recruited him to tow a van with his tow truck, but he was not aware that the tow was part of the plan for a robbery. (According to other testimony, the planners thought that someone could tow a van out of Genoa late at night without attracting police attention, whereas they thought that the police would look for a reason to stop a van leaving town on its own under the same conditions.) Paz met with defendant, Villarreal, and men who matched the descriptions of Middlekauff and Kappa at a McDonald's parking lot in Genoa. Villarreal, Middlekauff, and Kappa drove off in a van, and defendant and Paz went to wait in a bar, leaving the tow truck in the parking lot. They were at the bar for a short time when defendant received a call that caused him to become agitated. The two then drove at high speed back to the parking lot. The van arrived; Villarreal got out and told Paz to leave.

¶ 16    The parties stipulated to evidence of calls received and made by defendant's cell phone and the towers involved. That evidence placed his phone in or near Genoa during the attempted robbery. Villarreal's number was the source of two calls shortly after 10 p.m. They also stipulated to fingerprint evidence, in particular that defendant's fingerprints alone were found on six items,

most notably a Tru-Value Hardware bag from the van, a Tru-Value receipt otherwise linked to the purchase of gloves and duct tape, and the wrapping for a roll of duct tape from the van.

¶ 17   Trial counsel cross-examined all witnesses, largely focusing on what each witness knew about John Stark. Mason testified that Stark had been his partner in selling marijuana for years but that they fell out over a debt Stark owed Mason. Mason, not long before the incident, had stolen a classic car belonging to Stark. Mason said that this was partly debt collection and partly revenge. Trial counsel tried to question the law-enforcement witnesses about their interest in Stark as a suspect. The court largely sustained the State's objections to this line of questioning. However, a few answers suggesting police interest in Stark and his relationship to the incident came in.

¶ 18   Defendant was the primary defense witness. He testified that Stark was his marijuana supplier before he started buying from Mason. Just before the incident, Stark approached him and suggested that Stark could supply marijuana in the quantities he wanted. Because of Stark's offer, defendant went to Genoa on the evening of February 4. He was there when the van arrived with the injured Middlekauff. He searched through the material in the van, looking for something to stanch Middlekauff's bleeding. In the process, he touched many items in the back of the van and dumped a first-aid kit on the floor.

¶ 19   During closing argument, the State argued:

> "Another way you can look at [accountability], ladies and gentlemen, is every time you hear that Jason Middlekauff or Jaime Villarreal or Mike Kappa did something, you can insert the defendant's name. You can insert the defendant's name as the person that did the act.

The State concluded its closing argument with the following:

"You know, ladies and gentlemen, Jason Middlekauff has paid the price for his actions that night. Michael Mason has paid the price for his actions that night. Jaime Villarreal has paid the price for his actions that night. Michael Kappa *** paid the ultimate price for his actions that night and it's now time for you to hold the defendant to that price and I'm confident based on the evidence that you will find him guilty of unlawful possession of [a] weapon by a felon, home invasion and murder."

In rebuttal closing argument, the State argued:

"We know that Jason Middlekauff did not enjoy being here. We also know that his participation in the events at Michael Mason's house earned him a conviction for murder and a 20-year sentence in prison, a sentence that he was clearly not happy with."

The State further stated:

"Michael Mason was prosecuted and sent to prison for bringing marijuana into that neighborhood in the first place. Jaime Villarreal was prosecuted and sent to prison. Jason Middlekauff was prosecuted, convicted of murder and sent to prison, courses [*sic*] and as *** said earlier, Michael Kappa received the ultimate punishment for his participation.

They all committed crimes and they are all guilty and the evidence proves that this defendant is also guilty."

¶ 20 The jury found defendant guilty of all three counts, and he was sentenced to a total of 33 years' imprisonment. In addition to posttrial motions filed by his counsel, defendant filed a *pro se* motion alleging ineffective assistance of counsel. The motion ultimately proceeded to a *Krankel* hearing, after which it was denied.

¶ 21    Defendant appealed, arguing that his trial counsel was ineffective for mishandling hearsay objections and stipulating to facts that harmed defendant. We affirmed. *Swaggerty*, 2015 IL App (2d) 140854-U.

¶ 22    On September 20, 2016, defendant filed a *pro se* petition for relief under the Post-Conviction Hearing Act (Postconviction Act) (725 ILCS 5/122-1 *et seq.* (West 2016)). The petition advanced to the second stage, and defendant filed an amended petition through counsel on April 2, 2019. Defendant alleged that (1) he was denied his right to a fair trial by an impartial jury in that the trial court failed to remove three biased jurors and improperly read his indictment to the jurors, (2) he was denied his right to a public trial because his family was excluded from the courtroom several times, (3) he was denied his right to the disclosure of potentially exculpatory evidence, (4) his trial counsel was ineffective for numerous reasons, including for failing to object to the State's remarks during closing arguments that improperly imputed guilt to him by commenting on his co-defendants' convictions, (5) there was newly discovered evidence of actual innocence, (6) his due process rights were violated because an assistant state's attorney did not honor her agreement to testify at the hearing on his motion to reconsider his sentence, (7) posttrial counsel was ineffective, (8) appellate counsel was ineffective, and (9) his due process rights were violated when the prosecution knowingly solicited false testimony from Mason, Middlekauff, and Villarreal.

¶ 23    The State filed a motion to dismiss the petition on June 14, 2019, and it filed an amended motion to dismiss on December 3, 2019. The trial court granted the motion to dismiss on February 14, 2020. On the issue of improper closing argument, the trial court found that the State did not argue that the co-defendants' guilty pleas were evidence of defendant's guilt or improperly impute guilt to defendant, such that trial counsel was not ineffective for choosing not to object. The trial court found that even if the State's comments were improper, any error was cured when the jury

was instructed that evidence that a witness had been convicted of an offense may be considered only as it may affect the witness's believability.

¶ 24    Defendant timely appealed.

¶ 25                                    II. ANALYSIS

¶ 26    On appeal, defendant argues that the trial court erred in granting the State's motion to dismiss his amended postconviction petition. Defendant asserts that his petition should advance to the third stage of proceedings because he made a substantial showing that (1) the State improperly imputed guilt to him through multiple references to his co-defendants' guilt and punishment, and (2) his attorneys were ineffective for failing to object to these references and preserve the issue for appeal.

¶ 27    The Postconviction Act provides a means for individuals serving criminal sentences to assert that their convictions resulted from substantial denials of their constitutional rights. *People v. Johnson*, 2017 IL 120310, ¶ 14. It creates a three-stage process for adjudicating postconviction petitions. *Id.* During the first stage, the trial court independently determines, without input from the State, whether the petition is "frivolous or is patently without merit." 725 ILCS 5/122-2.1 (West 2018). If the trial court determines that the petition is not frivolous or patently without merit, the petition advances to second-stage proceedings. *People v. Lesley*, 2018 IL 122100, ¶ 31. At this stage, the trial court will appoint counsel for a petitioner who cannot afford to hire counsel (725 ILCS 5/122-4 (West 2018)), and counsel may file an amended petition (*People v. Johnson*, 2021 IL 125738, ¶ 27)). The State may either answer the petition or move to dismiss the petition. 725 ILCS 5/122-5 (West 2018); *People v. Dupree*, 2018 IL 122307, ¶ 29. To survive dismissal, the petition must make a "substantial showing" of a deprivation of constitutional rights. *Id.* ¶ 28. The trial court examines the petition to determine its legal sufficiency, and it must accept as true any

allegations not affirmatively rebutted by the record. *Id.* ¶ 29. "[T]he substantial showing of a constitutional violation that must be made at the second stage is 'a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, which if proven at an evidentiary hearing, would entitle petitioner to relief.' " *Id.* (quoting *People v. Domagala*, 2013 IL 113688, ¶ 35). If the petition survives the second stage, it advances to a third stage evidentiary hearing. *People v. House*, 2021 IL 125124, ¶ 17. Where, as in this case, the trial court dismisses a postconviction petition at the second stage, we review its ruling *de novo. Dupree*, 2018 IL 122307, ¶ 29.

¶ 28    Defendant's postconviction petition alleged ineffective assistance of counsel. For such a claim, a defendant must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Hodges*, 234 Ill. 2d 1, 17 (2009). The defendant must first establish that, despite the strong presumption that trial counsel acted competently and that the challenged action was the product of sound trial strategy, counsel's representation fell below an objective standard of reasonableness under prevailing professional norms such that he or she was not functioning as the counsel guaranteed by the sixth amendment. *People v. Manning*, 227 Ill. 2d 403, 416 (2008). Second, the defendant must establish prejudice. *People v. Valdez*, 2016 IL 119860, ¶ 14. In most situations this is done by showing a reasonable probability that the proceeding would have resulted differently absent counsel's errors. *Id.* A failure to establish either prong of the *Strickland* test precludes a finding of ineffectiveness. *People v. Peterson*, 2017 IL 120331, ¶ 79. At the second stage of postconviction proceedings, a defendant must make a substantial showing that counsel's performance was deficient and a substantial showing that the defendant was prejudiced. *People v. Johnson*, 2019 IL App (1st) 162999, ¶ 55.

¶ 29    Evidence that a co-defendant or accomplice has pleaded guilty or has been convicted of the same offense is inadmissible to prove the guilt of the defendant on trial, but it is admissible for purposes of impeaching the co-defendant or accomplice. *People v. Sullivan*, 72 Ill. 2d 36, 42 (1978). "A defendant who is separately tried is entitled to have his guilt or innocence determined upon the evidence against him without being prejudged according to what has happened to another." *Id.* "Evidence of another's guilt is particularly prejudicial to the defendant when the prosecutor is permitted to argue to the jury, explicitly or implicitly, that such evidence may be considered by them in determining the guilt of the defendant." *Id.* at 43.

¶ 30    Defendant argues that Middlekauff and Villareal were charged with home invasion and Kappa's death and that both of the men had their cases resolved before they testified at defendant's trial. Defendant asserts that it was highly prejudicial for the State to repeatedly refer to their convictions and punishment while implying that he committed the same crimes and urging the jury to convict him. Defendant argues that the prejudice was amplified because the State sought to convict him through a theory of accountability

¶ 31    Defendant extensively cites *Sullivan*, where the defendant was convicted of armed robbery. *Sullivan*, 72 Ill. 2d at 37-38. Prior to the defendant's trial, two alleged accomplices pleaded guilty to armed robbery and were serving their sentences. *Id.* at 39. Our supreme court held that the prosecutor's disclosure of the accomplices' guilty pleas during opening statements and upon direct examination of one of the accomplices, and the prosecutor's reliance on the guilty pleas in urging the jury to find the defendant guilty, constituted a single continuous error depriving the defendant of a fair and impartial trial. *Id.* at 41-42. Specifically, during opening statements, the prosecution stated:

> " 'We also, I believe, will have the opportunity of hearing from the other two convicted armed robbers in this same instance, Clarence Armstrong and Albert Matthews, as to their being brought here this afternoon to testify what they know about [the defendant's] participation in this act.' " *Id.* at 39.

In closing arguments, the prosecutor stated:

> " '(Defendant), just as Mr. Matthews did and just as Mr. Armstrong had a part in it, they all had their own individual role to play in this armed robbery.
>
> Now, what about those two others? They both pleaded guilty to the same charge. They're both in Menard. They both were brought up here today, as you could tell, rather reluctantly. They were called to the stand and didn't want to testify, particularly Mr. Matthews. * * *
>
> Now, if you think (defendant) was innocent, why was he with those two guys that are in prison now who pled guilty to armed robbery?
>
> Now, common sense will tell you, reason will tell you that (defendant is) just as guilty as the other two, because he was in there. He had the money.
>
> (A)lthough it's a circumstantial case you can't help but find that he's guilty of armed robbery, just like his two friends, in spite of their effort to help him by their reticence and their code of honor whatever you want to call it.' " *Id.* at 40.

In surrebuttal argument, the prosecutor stated:

> " 'I believe you'll get an instruction from the court that will tell you about the responsibility of an accessory, and I believe it will be something like this: That an accessory is responsible for the acts of those he participated with.' " *Id.* at 41.

The prosecutor also stated:

" '(Defendant is) really clever. He's been around, and he's dangerous, he's just as guilty of armed robbery as any of the other two that have already pled guilty.' " *Id.*

¶ 32    The appellate court held that the State's disclosure of the accomplices' guilty pleas during opening statements and during direct examination, and the State's reliance on the guilty pleas during closing argument in urging the jury to find the defendant guilty, was a single continuous error that deprived the defendant of a fair and impartial trial. *Id.* at 41-42. The court distinguished *Graff v. People*, 208 Ill. 312 (1904), where a co-defendant voluntarily changed his plea to guilty during the trial, in front of the jury. The supreme court in *Graff* held that such action was not in the control of either the trial court or the State, and that the trial court addressed the issue by instructing the jury that the co-defendant's plea should not influence it in arriving at a verdict and should not be considered as evidence of the other defendants' guilt. *Graff*, 208 Ill. at 325-26. In *Sullivan*, the supreme court stated that in the case before it the prosecutor initiated the error by injecting the accomplice's guilty plea into the trial on three separate occasions, and that unlike *Graff*, the jury was never instructed on the issue. *Sullivan*, 72 Ill. 2d at 43.

¶ 33    The *Sullivan* court also distinguished *People v. Baker*, 16 Ill. 2d 364, 372-73 (1959), where an accomplice testified as to his participation in and his confession to the crime for which the defendant was being tried. The supreme court in *Baker* held that because the accomplice admitted his guilt in his testimony, there was no prejudice in allowing him to testify that he had confessed to the crime, especially considering that the jury was instructed not to take into consideration the guilt or innocence of co-defendants who were not on trial. *Id.* at 373.

¶ 34    Defendant argues that this case is very similar to *Sullivan* in the way the prosecution used Middlekauff's and Villareal's convictions and punishment as a theme throughout trial to suggest defendant's guilt. Defendant argues that his case is also distinguishable from *Graff* and *Baker*

because in those cases, the State did not rely on the accomplices' guilt in closing argument, and here the jury was never instructed to not take into consideration the guilt or innocence of co-defendants while deliberating on defendant's guilt. See also *People v. Stover*, 89 Ill. 2d 189, 195-96 (1982) (the defendant was prejudiced where the State repeatedly emphasized in closing argument that the defendant's brother pleaded guilty to the same offense, implying that the defendant's guilt "could be gauged accordingly," and the jury was not instructed to disregard the improper evidence).

¶ 35    Defendant acknowledges that the trial court instructed the jury that "[e]vidence that a witness has been convicted of an offense may be considered by you only as it may affect the believability of the witness." Defendant asserts that this instruction is meant to address the credibility of a previously-convicted witness when the witness has been impeached by proof of a prior conviction (see Illinois Pattern Jury Instructions, Criminal, No. 3.12 (approved Oct. 17, 2014)), and it does not tell the jury that it should disregard an accomplice's admission of guilt when deciding the guilt of the defendant. Defendant maintains that the State did not use the evidence of the guilty pleas merely for the purposes of impeachment, but rather to link them to defendant's alleged guilt. He asserts that because the State improperly imputed guilt to him without objection, there is a reasonable probability that but for counsel's ineffective assistance, the trial's outcome would have been different.

¶ 36    Defendant argues that appellate counsel was also ineffective for failing to raise this issue on direct appeal. Defendant argues that although postconviction counsel raised the issue of trial and appellate counsel's ineffectiveness, he did not specifically raise the issue of posttrial counsel's ineffectiveness for not raising the issue in a posttrial motion. Defendant further notes that postconviction counsel did not argue that the State made improper remarks during opening

argument and direct examination. He argues that postconviction counsel preserved the issue by arguing that closing arguments were improper, but he argues that if the issue was forfeited, postconviction counsel rendered unreasonable assistance.

¶ 37 The State relies on *People v. Calloway*, 185 Ill. App. 3d 136, 143 (1989), where the court held that there was no error in allowing evidence of the codefendants' convictions because they were simply testifying that the defendant was their drug supplier, and the jury "was entitled to know the full extent of [the] defendant's scheme." The court further held that the State's closing argument was not "outrageous" like that in *Sullivan*. *Id.* The State argues that *Calloway* is consistent with what occurred here, in that Mason and Villarreal testified about their relationship with defendant and the events on the day in question, and Middlekauff testified to statements he gave to police at the time of the incident.

¶ 38 The State additionally argues that this case does not violate the rule set out in *Sullivan* because the record shows that the prosecution did not improperly rely on the accomplices' convictions to prove defendant's guilt, but instead directed the jury to the evidence presented. The State maintains that since there was no error, defense counsel did not perform deficiently in not objecting at trial or raising the issue on direct view. The State argues that even if the comments were improper, any error was cured when the trial court gave the instruction limiting the jury's consideration of a co-defendant's conviction to his credibility, such that defendant cannot show that he suffered prejudice. The State therefore asserts that the trial court properly granted its motion to dismiss defendant's postconviction petition.

¶ 39 We conclude that even if, *arguendo*, the State's comments about the co-defendants' charges and convictions were improper such that defendant's trial counsel was deficient in failing to object to the statements, defendant has failed to make a substantial showing of the second prong

of the *Strickland* test, *i.e.*, that defendant was prejudiced because there is a reasonable probability that the trial would have resulted differently absent counsel's errors.

¶ 40    First, the complained-of comments here are far less egregious than those in *Sullivan*. The prosecution in *Sullivan* encouraged the jury to find the defendant guilty based on his co-defendants' guilt by stating:

> " 'Now, if you think (defendant) was innocent, why was he with those two guys that are in prison now who pled guilty to armed robbery?
>
> Now, common sense will tell you, reason will tell you that (defendant is) just as guilty as the other two, because he was in there. He had the money.
>
> (A)lthough it's a circumstantial case you can't help but find that he's guilty of armed robbery, just like his two friends ***.' " *Sullivan*, 72 Ill. 2d at 40.

The prosecution also stated in surrebuttal argument that the defendant was " 'just as guilty of armed robbery as any of the other two that have already pled guilty.' " *Id.* at 41.

¶ 41    Here, in contrast, the prosecution stated in opening statements that Mason, Middlekauff, and Villarreal were "charged and convicted," and then stated, "This is a case with a lot of guilty people, but *the evidence will show* that there is one more guilty party and he sits right there." (Emphasis added.) The State therefore linked defendant's alleged guilt to the evidence that would come out at trial, as opposed to the fact that the victim and co-defendants had pleaded guilty.

¶ 42    The State's theme of focusing on the evidence continued into closing argument. It stated that Middlekauff, Mason, and Kappa had "paid the price for [their] actions that night, and that it was "confident *based on the evidence* that [the jury would] find [defendant] guilty of unlawful possession of weapon by a felon, home invasion and murder." (Emphasis added.). Similarly, in rebuttal closing argument, the prosecution stated, "They all committed crimes and they are all

guilty and *the evidence proves that this defendant is also guilty*." (Emphasis added.). Accordingly, the State correctly emphasized that the jury was to arrive at its decision based on the evidence presented.

¶ 43    This case is also distinguishable from *Sullivan* because in *Sullivan* there was evidence that the defendant directly participated in the armed robbery, in that one of the assailants was wearing plaid pants, as was defendant when he was apprehended. *Sullivan*, 72 Ill. 2d at 38. Here, in contrast, defendant was not involved in executing the attempted robbery of Mason, but rather was alleged to have planned the robbery. Part of defendant's defense was that Stark had arranged the robbery, not defendant, and that defendant and the other witnesses feared Stark, which was why the other witnesses falsely testified against defendant. Therefore, the fact that co-defendants pleaded guilty had less weight in this case than it does in many others.

¶ 44    Further, unlike in *Sullivan*, here the jury was instructed that "[e]vidence that a witness has been convicted of an offense may be considered by you only as it may affect the believability of the witness." Though the jury was not specifically instructed that evidence of co-defendants' guilt should not be considered as evidence of defendant's guilt, the jury in *Baker* also did not receive such an instruction, but rather was instructed that it was not to take into consideration the guilt or innocence of co-defendants who were not on trial. *Baker*, 16 Ill. 2d at 373. More importantly, the jury instruction that was given here properly instructed the jury on how it should consider the co-defendants' convictions.

¶ 45    Last, there was significant evidence of defendant's guilt in this case. Mason testified in detail about his relationship with defendant as a marijuana supplier, defendant's debt to him, and that defendant was the only person who knew that Mason had over 100 pounds of high-quality marijuana in his house. Villarreal testified that defendant was the person who suggested robbing

Mason and participated in preparations for the crime, in that the gun used in the home invasion was taken from a safe in defendant's garage, and that defendant went to the hardware store with Villarreal to buy gloves and duct tape. Middlekauff testified that he could not remember the incident but that his statements to the police at that time were correct, and those statements were consistent with Villarreal's testimony. Paz testified that he was with defendant and the other men when Villarreal, Middlekauff, and Kappa drove off in a van from a parking lot, at which point Paz and defendant waited at a bar. A short time later, defendant received a phone call and became very agitated. They raced back to the parking lot, and Villarreal got out of the van and told Paz to leave. Defendant stipulated to evidence of phone calls that placed his phone near Genoa during the attempted robbery and showed that he received two calls from Villarreal's number shortly after 10 p.m. He also stipulated to evidence that just his fingerprints were found on various items in the van, including a Tru-Value receipt showing the purchase of glove and duct tape, and the wrapping for the duct tape roll. Defendant and Villarreal fled to Mexico after the incident. See *People v. Harris*, 225 Ill. 2d 1, 23 (2007) (evidence of flight is admissible as proof of consciousness of guilt).

¶ 46    Based on all of these considerations, defendant has failed to make a substantial showing that there is a reasonable probability the trial would have resulted differently absent trial counsel's alleged error. Therefore, we need not address his claims regarding the ineffectiveness of subsequent counsel for failing to preserve this issue, and we conclude that the trial court did not err in granting the State's motion to dismiss defendant's postconviction petition.

¶ 47                                III. CONCLUSION

¶ 48    For the reasons stated, we affirm the judgment of the circuit court of De Kalb County.

¶ 49    Affirmed.