2024 IL App (1st) 220814-U

No. 1-22-0814

Order filed January 18, 2024

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 16765 |
| | ) | |
| ROSS WELLINGTON, | ) | Honorable |
| | ) | Joanne F. Rosado, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE OCASIO III delivered the judgment of the court.
Presiding Justice Rochford and Justice Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction is affirmed over his contention that he was deprived of a fair trial because the State committed misconduct during rebuttal closing argument.

¶ 2    Following a jury trial, defendant Ross Wellington was convicted of nine counts of aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(1), (3), (4) (West 2016)) and sentenced to an aggregate term of 80 years' imprisonment. On appeal, Wellington contends that he was denied his statutory right to a speedy trial and that he was deprived of a fair trial where the State

committed misconduct during rebuttal closing argument by bringing in improper and unsubstantiated other crimes evidence, taking away the responsibility of the jury to weigh the evidence presented, and impugning defense counsel. For the reasons that follow, we affirm.

¶ 3                                    BACKGROUND

¶ 4      Wellington's convictions arose from the events of October 4, 2016. Following his arrest, he was charged by indictment with 12 counts of aggravated criminal sexual assault, one count of armed robbery, and one count of aggravated battery. Prior to trial, the State nol-prossed three of the counts of aggravated criminal sexual assault, the count charging armed robbery, and the count charging aggravated battery.

¶ 5      At trial, M.C. testified that she had been "disabled" since she was nine years old but did not know what her disability was. The highest grade she had completed was sixth. She stated she did not know how to read or write and that she stopped going to school because her mother died and she went to live with an aunt. In 2016, she was living with her aunt and a cousin near the intersection of 119th Street and Harvard Avenue in Chicago.

¶ 6      On the evening in question, M.C. was walking to a neighborhood store to buy cigarettes when Wellington, whom she identified in court, came up behind her and put a sharp object to the middle of her back. She turned and saw the side of his face, but he told her not to look at him and that, if she did, he would have someone kill her or kill her himself. Then, with his right hand holding the sharp object to her back and his left hand on her shoulder, he walked M.C. to a nearby vacant building. M.C. had never been to the building before.

¶ 7      Wellington walked M.C. through a brown door in the alley and upstairs to a room that had brown carpet and no furniture. There, he made M.C. take off her clothes and got on top of her. He

put his penis in her vagina and also "made [her] put his thing in [her] mouth" a "gang of times." When asked for clarification, M.C. said a "gang" was "[l]ike three times." She also said that Wellington's penis was in her mouth "[f]or a long time" and in her vagina a "long time."

¶ 8 M.C. testified that during the assault, she was lying "on my back and then my front." She felt pain in her mouth and vagina. Wellington threatened that if she told anyone, he would kill her or have someone kill her. M.C. was scared and asked him not to hurt her. At some point, he retrieved a stick from a closet and threatened to hit or kill her with it. He also, at some point, put his hands around her neck, rendering her unable to breathe, and took money from her jacket pocket.

¶ 9 After Wellington left the building, M.C. ran home. She called her aunt and then, at her aunt's direction, called the police. She talked with the police about what happened and then paramedics transported her to the hospital. At the hospital, doctors and nurses examined her and she told them what happened.

¶ 10 A few days later, while her cousin was driving her home from a medical appointment, M.C. saw Wellington coming out of a neighborhood Boost Mobile store. He tried to get in their car. M.C. told her cousin that Wellington was the man who hurt her. According to M.C., her cousin was "getting ready to get him," but, when M.C. told her not to because the police were coming, her cousin "let the police handle it."

¶ 11 Chicago police officer Brian Holoubek testified that about 9:30 p.m. on October 4, 2016, he was dispatched to respond to a person in distress calling for help near the intersection of 119th Street and South Wentworth Avenue. When he and his partner arrived, they were flagged down by M.C., who was visibly upset and appeared to have been crying. M.C. told the officers that she

called because she had been sexually assaulted. M.C. was unable to give an exact location of where the assault occurred.

¶ 12    Emily Chittick, a registered nurse, testified that she treated M.C. in the emergency room. Chittick had an independent memory of M.C. because, although she was an adult, Chittick had to use "more child-like terminologies when assessing and treating her." M.C. was tearful, fearful, and nervous.

¶ 13    M.C. told Chittick that she was walking down the street when a man she did not know grabbed her and threatened to kill her if she told the police. He took her to an abandoned house, put his penis in her mouth, forced her on top of him, put his penis in her vagina, moved her onto her back, and put his finger in her vagina. As part of a criminal sexual assault kit, Chittick and a doctor collected M.C.'s underwear, scrapings from underneath her fingernails, combings of her head and pubic hair, and swabs of her mouth and vagina. M.C. complained of burning pain during the exam.

¶ 14    Dominique Jefferson, M.C.'s cousin, testified that on the night in question, M.C. came home in a panic, saying something had happened to her. She was very shaky, talking in a rush, and stuttering. The police picked M.C. up that night from a location down the street. When M.C. came back home the next day, she was withdrawn and not "her normal self."

¶ 15    On October 7, 2016, as Jefferson was driving M.C. home from a medical appointment, she saw a man, whom she identified in court as Wellington, coming out of a neighborhood Boost Mobile store. M.C. started shaking and said, "[T]hat's him. That's the guy." She also scooted her body down in her seat and tried to hide her head. Jefferson turned into the store's parking lot, drove over the curb, and, while trying to run Wellington over, cornered him. Wellington pretended he

had a gun in his shirt and shouted that he was going to shoot. M.C. was crying and shaking, and Jefferson yelled and cursed at Wellington. While this was going on, a police officer arrived at the scene. After M.C. gave the officer a copy of some paperwork, the officer arrested Wellington. On cross-examination, Jefferson stated that Wellington never tried to enter her car.

¶ 16     Chicago police officer Don A. Hoard, Jr., testified that around 2:50 p.m. on October 7, 2016, he and his partner were driving near the Boost Mobile store when he saw a car "hop the curb" and pin a pedestrian, whom he identified in court as Wellington, between the car's front bumper and a fence. Hoard exited his car and approached the scene on foot. The car's driver was screaming, and the passenger was visibly upset and emotional. The passenger told Hoard that Wellington raped her and gave him a copy of the victim incident notice, which Hoard explained is a form provided by the police with the report number and a number to call for follow-up investigation. After running the report number through the police portal system, Hoard arrested Wellington.

¶ 17     Chicago police detective David Garcia testified that he was assigned to M.C.'s case on October 5, 2016. On October 7, 2016, Garcia was informed that Wellington had been arrested and identified by M.C. as her assailant. That night, Garcia and an assistant state's attorney interviewed M.C. at the police station. M.C. gave a detailed statement but was unable to identify an exact location as to where the assault had occurred.

¶ 18     On October 9, 2016, Garcia and another detective drove M.C. around neighborhood streets and alleys for two or three hours. Eventually, they found the building where M.C. had been assaulted. After securing a search warrant, Garcia and other officers entered the residence. The residence was as M.C. had described it to Garcia, with brown carpeting and a bedroom at the top

of the stairs on the second floor. Jefferson then brought M.C. to the residence. When she saw the stairway leading to the bedroom she started crying and shaking. Jefferson ended the tour and took M.C. home.

¶ 19    A forensic biology specialist qualified as an expert in DNA analysis testified that she processed the DNA generated from the samples collected for M.C.'s criminal sexual assault kit. The vaginal and oral swabs were inconclusive for male DNA. The lip swab contained a mixed DNA profile of two contributors, one male and one female.

¶ 20    A forensic scientist with the Illinois State Police qualified as an expert in DNA analysis testified that she compared DNA generated from a buccal swab taken from Wellington with the male DNA profile extracted from M.C.'s lip swab. She found Wellington's DNA to be "included," meaning that he could be the donor of the lip swab's male DNA. The chances of a random person in the general population being included in the lip swab's male DNA profile were approximately 1 in 3.2 quadrillion for African American men.

¶ 21    Another forensic scientist with the Illinois State Police qualified as an expert in DNA analysis testified that he conducted Y chromosome testing on the samples collected in M.C.'s case. He found Wellington's DNA to be included when compared to DNA detected in the non-sperm fraction of M.C.'s vaginal swabs. The chances of a random African American man being included in the DNA profile were one in five.

¶ 22    Wellington made a motion for a directed verdict, which the trial court denied. Wellington did not testify or present any evidence.

¶ 23    Following closing arguments and instructions, the jury found Wellington guilty of nine counts of aggravated criminal sexual assault.

¶ 24    Defense counsel thereafter filed a motion for a new trial, a supplemental motion for a new trial, and a second supplemental motion for a new trial. Relevant here, counsel contended that the State made several improper arguments in rebuttal closing. Following argument, the trial court denied the motions.

¶ 25    The trial court subsequently sentenced Wellington to an aggregate term of 80 years' imprisonment: consecutive terms of 25 years in prison on count I, 25 years in prison on count II, and 30 years in prison on count III; and concurrent terms of 15 years in prison on counts IV, V, VI, X, XI, and XII. Wellington made a motion to reconsider sentence, which the trial court denied. Wellington filed a timely notice of appeal.

¶ 26                              ANALYSIS

¶ 27                          I.  Speedy Trial

¶ 28    In his opening brief, filed in November 2022, Wellington argued that the trial court erred in denying his pretrial motion to dismiss based on a speedy trial violation where the emergency COVID-19 administrative court orders tolling the Speedy Trial Act (725 ILCS 5/103-5 (West 2020)) unconstitutionally violated the separation of powers doctrine. As he noted in his reply brief, however, the Illinois Supreme Court has rejected this argument and held that the administrative orders were constitutional. *People v. Mayfield*, 2023 IL 128092, ¶¶ 23-39. He further indicated in his reply brief that he would abide by the outcome of a then pending petition for rehearing in that case, which has since been denied. *People v. Mayfield*, No. 129092 (Ill. May 22, 2023). Under *Mayfield*, we therefore hold that Wellington was not denied his statutory right to a speedy trial.

¶ 29                              II.  Remarks During Closing Argument

¶ 30    Wellington's remaining argument is that he was deprived of a fair trial where the State committed misconduct during rebuttal closing argument by impugning defense counsel, taking away the responsibility of the jury to weigh the evidence presented, and bringing in improper and unsubstantiated other crimes evidence. Specifically, Wellington asserts that the State's closing argument improperly (1) implied the defense was arguing that the State was "guilting" the jury, (2) invaded the role of the jury by arguing that the DNA evidence "convicts," and (3) insinuated Wellington was guilty of stalking, a crime that was not charged. He argues that the misconduct, when considered cumulatively, was not harmless. As relief, he seeks reversal and remand for a new trial.

¶ 31    A defendant has the right to a trial free from improper prejudicial comments or arguments by the State during closing arguments. *People v. Pasch*, 152 Ill. 2d 133, 184 (1992). "Whether a prosecutor's comments or arguments constitute prejudicial error is evaluated according to the language used, its relation to the evidence, and the effect of the argument on the defendant's right to a fair and impartial trial." *Id.* Prosecutors are allowed a great deal of latitude in making closing arguments. *Id.* A prosecutor may comment on the evidence and may draw all legitimate inferences deducible therefrom, even when those comments and inferences are unfavorable to the defendant. *Id.* Even where a prosecutor's remarks may have exceeded the bounds of proper comment, the jury's verdict must not be disturbed unless it can be said that the remarks resulted in substantial prejudice to the accused, such that absent those remarks the verdict would have been different. *Id.* at 185. Remarks made during a closing argument must be viewed not in isolation, but in the context of the entire argument. *People v. Thompson*, 2016 IL App (1st) 133648, ¶ 47.

¶ 32    This court has acknowledged confusion regarding the applicable standard of review, in light of "an apparent conflict" in supreme court precedent. *People v. Green*, 2017 IL App (1st) 152513, ¶¶ 78-9. In 2000, our supreme court stated that the trial court's determination of the propriety of remarks during closing argument "will not be disturbed absent a clear abuse of discretion." *People v. Blue*, 189 Ill. 2d 99, 128 (2000). However, in 2007, our supreme court subsequently stated that "[w]hether statements made by a prosecutor at closing argument were so egregious that they warrant a new trial is a legal issue this court reviews *de novo.*" *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007).

¶ 33    In this case, we need not decide whether *Wheeler* or *Blue* defined the precise standard of review. This is because under either standard, we find that the remarks challenged in this appeal did not constitute reversible error. See *People v. Cruz*, 2019 IL App (1st) 170886, ¶ 40 ("In this case, we would reach the same result under any standard of review.").

¶ 34    The first comment made by the State in rebuttal closing arguments which Wellington is now challenging, italicized below, is as follows:

> "Ladies and gentlemen, this case is one person's fault, and he sits right before you here today. *We are not here to guilt you into signing a guilty verdict to convict him of the brutal acts against [M.C.], we're not here to guilt you, no one wants you to be guilted.* You were picked because you—we believe that you all could be fair and give him a fair trial." (Emphasis added.)

Wellington asserts that the State made this comment in response to defense argument regarding the failure of the police to adequately investigate and that, in doing so, the State improperly impugned defense counsel by mischaracterizing her argument as claiming that the State was

"guilting" the jury. He argues that the State's remark accused defense counsel of attempting to free Wellington through trickery or deception, and implied that she was trying to manipulate the jury and was not trustworthy.

¶ 35 As an initial matter, Wellington acknowledges in his reply brief that defense counsel did not object to this portion of the State's rebuttal at trial and, therefore, that the issue is forfeited. Nevertheless, he asserts that this court may reach the issue under the second prong of the plain error doctrine. See *People v. Williams*, 193 Ill. 2d 306, 347-48 (2000) (plain error may be raised for the first time in the reply brief).

¶ 36 Under the plain error doctrine, a reviewing court may excuse a party's procedural default if a clear or obvious error has occurred and either: (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Staake*, 2017 IL 121755, ¶ 31. However, before we consider application of the plain error doctrine, we must determine whether any clear or obvious error occurred. *People v. Reese*, 2017 IL 120011, ¶ 60. This is because " 'without error, there can be no plain error.' " *People v Wooden*, 2014 IL App (1st) 130907, ¶ 10 (quoting *People v. Smith*, 372 Ill. App. 3d 179, 181 (2007)). Here, we find no clear or obvious error.

¶ 37 As noted above, Wellington asserts that the contested comment about "guilting" the jury was made by the State in response to the defense argument that the police failed to adequately investigate the case. The State counters that the prosecutor's remark was made in response to the following argument made by defense counsel in closing:

"The State went through a lot of explanation about the charges and what they all mean, but if you believe that my client didn't do it, then they're all not guilty. And it's not your fault if [M.C.] doesn't get the closure that she wants so desperately in this case. It's the Chicago Police Department's fault, and it's the People of the State of Illinois' fault."

After reviewing the entirety of the closing arguments, we agree with the State. The language used by the prosecutor to introduce the comments Wellington is challenging—" this case is one person's fault"—clearly echoes defense counsel's listing of who would or would not be at "fault" if M.C. did not experience closure.

¶ 38 Wellington is correct that a prosecutor may not, unless based on some evidence, argue in closing "that defense counsel fabricated a defense theory, attempted to free his client through trickery or deception, or suborned perjury." *People v. Emerson*, 97 Ill. 2d 487, 497 (1983); see also *People v. Monroe*, 66 Ill. 2d 317, 323 (1977). However, that was not what the State was doing here. The two cases Wellington cites in support of his argument that the prosecutor here improperly impugned defense counsel are distinguishable. In *Emerson*, the prosecutor argued to the jury that defense counsel "had laid down a smokescreen 'composed of lies and misrepresentations and innuendoes,' " and that "all defense attorneys try to 'dirty up the victim' to distract the attention of the jury from the defendant's crime." *Emerson*, 97 Ill. 2d at 497. In closing arguments in *Monroe*, the prosecutor accused defense counsel of "character assassination" of the State's witnesses, of not personally believing in the theory of defense he presented on behalf of his client, and of presenting a "fraudulent" closing argument. *Monroe*, 66 Ill. 2d at 323-34.

¶ 39 In the instant case, in contrast to *Emerson* and *Monroe*, the prosecutor did not make egregious or repeated remarks about defense counsel with the primary purpose of inflaming the

passions or antagonism of the jury. To the contrary, the prosecutor made no reference to defense counsel and, when read in context, the comment at issue merely responded to defense counsel's argument that it would be the fault of the police and the State, as opposed to the jury, if M.C. did not obtain closure. See *People v. Armstrong*, 183 Ill. 2d 130, 159-60 (1998) (finding that the prosecutor did not impugn the role of defense counsel and properly responded to the defense case when he argued "what a criminal justice system we have when a man can have that type of criminal history, have those acts behind him, have that brutality in his background and have lawyers who stand up here and be able to argue \*\*\* it's not his fault"). We find no clear and obvious error. As such, there can be no plain error and the issue remains forfeited. See *Reese*, 2017 IL 120011, ¶ 60.

¶ 40 The second comment made by the State in rebuttal closing arguments that Wellington is challenging, italicized below, occurred as follows:

"Certainly, it would be great if Olivia Benson [a fictional detective on *Law & Order: Special Victims Unit*] could come in here and do her thing and do all these things she needs to do, and we put on this pretty picture and we have the satellite photos and everything else going on. But you know what we have? *We have the DNA evidence in here that convicts him.*

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[ASSISTANT STATE'S ATTORNEY]: And, ladies and gentlemen, there are other items in that rape kit and they weren't tested, and you know why they weren't tested? Because *we had the DNA evidence—*

[DEFENSE COUNSEL]: Objection, your Honor.

[ASSISTANT STATE'S ATTORNEY]: —*from her lips*—

THE COURT: Overruled.

[ASSISTANT STATE'S ATTORNEY]: —*that convicts him.*" (Emphasis added.)

¶ 41    Wellington asserts that the State's argument that "DNA evidence *** convicts him" was improper and denied him a fair trial. He observes that it is the trier of fact who is responsible for making determinations regarding the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence. Wellington asserts that, by telling the jury that the DNA evidence "convicts" him, "the State took away this essential responsibility from the jury, telling the jury what weight to give to the DNA evidence instead of letting the jury determine its weight."

¶ 42    Wellington has cited no authority in support of his argument, save one case listing the general responsibilities of the trier of fact: *People v. Walls*, 2022 IL App (1st) 200167, ¶ 29. It is well-settled that, during closing arguments, a prosecutor "may not invade the province of the jury." *E.g.*, *People v. Enoch*, 189 Ill. App. 3d 535, 552 (1989). However, it is not improper argument for the prosecution to tell the jury that its evidence proved that a crime was committed. See *People v. Campbell*, 13 Ill. App. 3d 31, 34 (1973) (finding the prosecutor properly drew an inference based on the evidence when he argued, "I don't think anybody says he has got a right to struggle with a deputy. That is aggravated battery right there."); *People v. Swaggerty*, 2022 IL App (2d) 200173-U, ¶ 42 (finding that, in rebuttal closing, the State correctly emphasized that the jury was to arrive at its decision based on the evidence presented when the prosecutor argued, "the evidence proves that this defendant is also guilty"). In this case, where the prosecution asserted that the DNA evidence introduced at trial "convicts," that is, proved its case, we cannot find the argument

was improper or that the trial court abused its discretion in overruling counsel's objection to it. Wellington's contention fails.

¶ 43    The third comment made by the State in rebuttal closing arguments that Wellington is challenging, italicized below, occurred as follows:

"But in certain circumstances, one would think that a relative would support you, and when [Jefferson] saw [M.C.], what she was doing, she crouched down, she was shaking, she was shivering. She told her cousin, no, don't go and get him, don't go and get him, he's going to kill us. She didn't want justice then, but that is what her cousin did, her cousin went after him. And thank God she did, because we don't Olivia Benson. She's not on the street looking for [M.C.'s] rapist. But you know what? Everything happens for a reason, and that's *because he stalks that neighborhood.*

[DEFENSE COUNSEL]: Objection. Objection.

[ASSISTANT STATE'S ATTORNEY]: He roams that neighborhood.

THE COURT: Sustained.

[ASSISTANT STATE'S ATTORNEY]: He was out in the neighborhood the day he took [M.C.], and he was out in the neighborhood three days later." (Emphasis added.)

¶ 44    Wellington interprets the prosecutor's statement that he "stalk[ed]" the neighborhood as a reference to the criminal offense of stalking. See 720 ILCS 5/12-7.3 (West 2020). He therefore argues that the prosecutor's statement was "akin to improper other crimes evidence." He asserts that there was no evidence showing that he had committed that offense and that the prosecutor's argument did not speak to any of the proper purposes to which evidence of other crimes may be used under the rules of evidence. See Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Wellington maintains

that the State's argument went only to the improper purposes of showing propensity to commit crime and scaring the jurors. He argues that the accusation of stalking was "especially prejudicial where the record shows at least one juror was concerned about stalking by [him]."

¶ 45    We do not interpret the prosecutor's remarks as stating or implying that Wellington was committing the offense of stalking. The prosecutor's description of Wellington "stalk[ing] that neighborhood" came in the context of discussing the evidence that, while returning home from the hospital, M.C. and her cousin happened to see Wellington coming out of a neighborhood store. That description was using the term *stalk* in its ordinary sense of a predator seeking prey, not the technical legal sense of a defined criminal offense under state statutory law.

¶ 46    Even so, we do believe that the remark was not proper because a prosecutor may not imply during closing argument that the defendant has committed crimes other than the ones for which he is on trial. *People v. Valdery*, 65 Ill. App. 3d 375, 378-79 (1978). Here, the challenged statement that Wellington was "stalk[ing] that neighborhood" carried the implication that he was actively prowling his hunting ground in search of his next victim. In other words, the prosecutor suggested that, at the time he was arrested, Wellington was engaged in an attempt to commit some type of sexual assault. See 720 ILCS 5/8-4(a) (West 2016) ("A person commits the offense of attempt when, with intent to commit a specific offense, he or she does any act that constitutes a substantial step toward the commission of that offense."). Between the absence of evidence showing that Wellington was on the hunt and the plainly prejudicial nature of that implication, we agree that the remark was improper.

¶ 47    That does not end the inquiry, however, because the trial court can cure errors in a prosecutor's closing argument by giving the jury proper instructions on the law to be applied,

informing the jury that arguments are not themselves evidence and must be disregarded if not supported by the evidence at trial, or sustaining the defendant's objections and instructing the jury to disregard the inappropriate remark. *People v. Simms*, 192 Ill. 2d 348, 396 (2000); *People v. Pasch*, 152 Ill. 2d 133, 185 (1992). Here, the trial court sustained Wellington's objection to the prosecutor's use of the word "stalks." While the trial court did not immediately admonish the jury that it should disregard the prosecutor's remark, the court did orally admonish the jury prior to the beginning of closing arguments that "[w]hat the lawyers say during the arguments is not evidence and should not be considered by you as evidence" and "[i]f a lawyer makes a statement that is not based on evidence or reasonable inferences to be drawn from the evidence, you should disregard that statement." The court also tendered to the jury written instructions, which informed the jury the evidence to be considered consists only of the testimony, exhibits, and stipulations presented at trial and that closing arguments are not evidence and any statement or argument made which is not based on the evidence should be disregarded. We find that the trial court's act of sustaining Wellington's objection to prosecutor's argument that he was "stalk[ing] that neighborhood" was sufficient to forestall any prejudice. See *People v. Kidd*, 175 Ill. 2d 1, 41-42 (1996). This is especially so where the trial court properly admonished and instructed the jury that attorneys' arguments are not evidence and must be disregarded if not supported by the evidence presented at trial. See *Pasch*, 152 Ill. 2d at 185; *People v. Desantiago*, 365 Ill. App. 3d 855, 866 (2006). Wellington's contention fails.

¶ 48    In rejecting Wellington's argument, we are mindful of his assertion that the State's reference to stalking was especially prejudicial where the record showed at least one juror was

- 16 -

concerned about him stalking her. However, we cannot agree with Wellington's characterization of the record on this point.

¶ 49    The record reveals that the day after the jury's verdict was announced, the State moved to seal the juror cards and verdict forms, arguing that the jurors were entitled to the safeguarding of their personal information, including birthdates, addresses, occupations, and addresses of employment. Defense counsel objected, arguing that doing so "would inhibit the ability of Mr. Wellington's appellate attorneys." The State countered that the jurors' background information should not be part of the public record and, if their personal information was needed on appeal, the sealed documents could be opened for that purpose. The court granted the State's motion, commenting, "I would state that after both sides left last night, I did have a juror approach me and ask that her information not be public, that she had concerns about this type of situation. So, I will seal them."

¶ 50    In our view, the context surrounding the trial court's statement that a juror "had concerns about this type of situation" shows simply that the juror was apprehensive about her personal information being made a matter of public record. It would be conjecture to expand her general concern to a specific worry that Wellington would stalk her, and entirely speculative to conclude that such a worry stemmed from the prosecutor's single utterance of the word "stalks" in rebuttal closing arguments.

¶ 51    Finally, Wellington contends that he was denied a fair trial due to the cumulative effect of the prosecution's improper conduct. A reversal on the ground of cumulative error presupposes that there are multiple errors. See *People v. Speight*, 153 Ill. 2d 365, 376 (1992) (describing cumulative-

error doctrine). As we have only found a single instance of improper argument, there is no basis for reversing on the ground of cumulative error.

¶ 52                              CONCLUSION

¶ 53     For the reasons explained above, we affirm the judgment of the circuit court.

¶ 54     Affirmed.